UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RONALD CHISOM, et al., | § | CIVIL ACTION NO.: 86-4075 |
|     Plaintiffs, | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
|     Plaintiff-Intervenor, | § | |
| | § | |
| BERNETTE J. JOHNSON, | § | |
|     Plaintiff-Intervenor | § | SECTION A |
| | § | |
|     Versus | § | |
| | § | |
| PIYUSH ("BOBBY") JINDAL, et al., | § | |
|     Defendants | § | MAGISTRATE ____ |

**MEMORANDUM IN SUPPORT OF PLAINTIFF-INTERVENOR BERNETTE J. JOHNSON'S MOTIONS: (1) TO REOPEN CASE, (2) TO JOIN AS DEFENDANTS JUSTICES KIMBALL, VICTORY, KNOLL, WEIMER, GUIDRY, AND CLARK OF THE LOUISIANA SUPREME COURT (3) AND FOR CONTEMPT AGAINST JUSTICES KIMBALL, WEIMER, GUIDRY AND CLARK**

I.  INTRODUCTION

Plaintiff-Intervenor Bernette J. Johnson,[1] an Associate Justice of the Louisiana Supreme Court ("Justice Johnson"), by and through the undersigned counsel, bring these motions to prevent Defendants and the Louisiana Supreme Court from contravening the aspect of the Consent Judgment[2] agreed to by the plaintiffs, defendant Louisiana officials, and the United States, and signed by the Court in this case regarding the tenure of any justice ("Chisom justice") elected under the Consent Judgment.

---

[1] Justice Johnson moved to intervene in this action in 1997 and the motion to intervene was granted. Motion to Intervene, Ex. A.

[2] The Consent Judgment was originally signed in 1992 and amended in 2000. The 1992 Consent Judgment, Ex. B. The Joint Motion to Amend Consent Judgment and Order, Dkt. 135, which was signed on January 3, 2000, Ex. C.

The issue has arisen in the context of the succession for Chief Justice of the Louisiana Supreme Court. Article V, §6 of the Louisiana Constitution provides that the justice with the longest service on the court shall serve as the Chief Justice of the Louisiana Supreme Court. The current Chief Justice, Catherine Kimball, has announced that she is retiring from the Supreme Court in January 2013. Justice Johnson, has served on the Supreme Court continuously since October 1994, when she was elected from the temporary judicial position created by the Consent Judgment. Justice Johnson was then re-elected to the Supreme Court in 2000 when the Court retracted to seven members. Justice Johnson has been serving on the Court longer than any of the remaining justices except Chief Justice Kimball. The Consent Judgment provides that the <u>Chisom</u> Justice shall have the same rights and duties as the other justices, and that any tenure accrued while the <u>Chisom</u> Justice is assigned to the Louisiana Supreme Court shall be credited to that judge. As a result, under the terms of the Consent Judgment, Justice Johnson is to be the next Chief Justice upon Chief Justice Kimball's retirement.

Justice Victory, even though he has only served on the Louisiana Supreme Court since January 1995, claims that he should succeed Justice Kimball as Chief Justice because Justice Johnson's years as the <u>Chisom</u> Justice should not count as years of service on the Supreme Court. Instead of abiding by the Consent Judgment, Chief Justice Kimball issued an order on June 13, 2012 ("the June 13 Order"), on behalf of herself and Justices Guidry, Clark, and Weimer stating that the Louisiana Supreme Court would determine who would succeed her as Chief Justice. Under this Order, "*[a]ny sitting justice interested in a legal determination*" of who should succeed Chief Justice Kimball as the "*judge oldest in point of service*" shall file papers with the Louisiana Supreme Court on July 31, 2012 and shall respond to any opposing filings by August 15, 2012. Justice Johnson, along with Justices Victory and Knoll, whose

service on the Louisiana Supreme Court began after Justice Johnson was already serving on the Court as the Chisom justice, were deemed recused by the June 13, 2012 Order and replaced with three Louisiana circuit court judges.

Because the Consent Judgment specifically addresses and resolves the issue of years of service, the Louisiana Supreme Court does not have the authority under federal law, let alone state law, to devise and implement the process mentioned above. By doing so, the six members of the Louisiana Supreme Court are acting in violation of the Consent Judgment. For these reasons, Justice Johnson seeks an order reopening the case, joining the members of the Louisiana Supreme Court as defendants, and for contempt to stop the members of the Louisiana Supreme Court from implementing the June 13, 2012 Order. Justice Johnson requests that the Court resolve this issue before the July 31, 2012 filing deadline set forth in the aforementioned order.

## II.     BACKGROUND

In the late 1980s, there were two vote dilution cases brought under Section 2 of the Voting Rights Act involving state court judgeships in Louisiana. The goal of these cases was to integrate the state court bench in Louisiana. The case *sub judice* challenged the method of electing justices to the Louisiana Supreme Court. The other case was a similar challenge involving family court, district court and court of appeal judges that resulted in a finding of liability. Clark v. Roemer, 777 F. Supp. 471 (M.D. La. 1991).

At the time Plaintiffs brought suit in 1986, five (5) members of Louisiana Supreme Court were elected from single-member districts and the remaining two (2) members were elected from the First Supreme Court District which consisted of Orleans, St. Bernard, Plaquemines, and Jefferson parishes. Plaintiffs asserted that the at-large method of electing two justices from this First Supreme Court District impermissibly diluted minority voting strength, in violation of

Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 ("Section 2"), and the Fourteenth and Fifteenth Amendments of the United States Constitution. At the time, African Americans comprised approximately thirty-four percent of the population and thirty-two percent of the registered voter population in the First District. Whites comprised the majority of the District population (approximately sixty-three percent) and the majority of the registered voter population (approximately sixty-eight percent). Chisom v. Edwards, 839 F.2d 1056, 1057-58 (5th Cir. 1988). The District's population was not, however, evenly distributed across parishes. Orleans Parish was home to over one half of the District's population and over half of its registered voters. Importantly, Orleans Parish was the hub of black voting power in the district. The parish's population was fifty-five percent African-American and the group comprised fifty-two percent of the black registered voter population in the parish. Id.

No African-American had ever been elected to the Louisiana Supreme Court. Id. Plaintiffs sought to divide the First District into two—one majority black district encompassing Orleans Parish and one comprised of the other three majority white parishes. Their requested remedy would result in seven single member districts from which one justice each would be elected. Most importantly, Plaintiffs believed that this plan would give the voters of Orleans Parish a fair opportunity to elect a black justice to the state Supreme Court. Chisom v. Roemer, 501 U.S. 380, 385 (1991); Declaration of Marc Morial ("Morial Dec." ¶ 3) attached hereto as Ex. D.

The case was litigated before the Eastern District of Louisiana, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court. A threshold issue in the litigation was whether Section 2 of the Voting Rights Act applied to judicial elections. After the district court dismissed the case on the ground that judicial elections could not be the subject of a

Section 2 vote dilution case and the 5th Circuit eventually affirmed that dismissal, Chisom v. Edwards, 917 F.2d 187 (1990), the United States Supreme Court held that judicial elections are within the scope of Section 2. Chisom v. Roemer, 501 U.S. at 403-04.

The two Louisiana Supreme Court justices in the First District, Justice Calogero and Justice Marcus, thereafter moved to intervene as defendants in this action. In his Memorandum in Support of the Motion to Intervene, Justice Calogero stated that he did not contest liability, Memorandum in Support of Motion to Intervene of Pascal F. Calogero, Jr., Ex. E, at 5, but that he sought to participate in the litigation to protect his seat:

> *The object of this suit is to divide the First Supreme Court into two single-Justice districts. Such a division will directly affect his interest in continuing to serve on the Supreme Court when he runs again. The outcome of this litigation could also affect his tenure in the office to which he has recently been elected. The issue of whether the October 1988 election should be allowed to take place was litigated in the proceeding. Justice Calogero has an obvious and concrete interest in serving out his ten-year term as mandated by the Louisiana Constitution.*

Id. at 2-3. Justice Marcus took a similar position in his Memorandum in Support of his Motion to Intervene, Ex. F, at 1-3.

The favorable United States Supreme Court decision made the Chisom plaintiffs very confident they would ultimately succeed in the litigation and compel Louisiana to create an Orleans-based district that would have a black majority of registered voters. Declaration of Marc Morial ("Morial Dec." ¶ 4) Ex. D. The Chisom plaintiffs were therefore prepared and empowered to continue the litigation to its end, which would result in a redistricting the Louisiana Supreme Court. Id. However, such a redistricting would have created serious political problems for Justice Calogero and Justice Marcus, the two members of the Louisiana Supreme Court who were elected to the majority white, multi-parish First district. Id.

Settlement discussions therefore ensued with the parties seeking a compromise that would enable African-American voters to elect a candidate of their choice from an Orleans Parish-based seat, while enabling Justices Calogero and Marcus to serve the remainder of their terms. Id. This is how the idea of temporarily expanding the Louisiana Supreme Court to eight (8) Justices began.

All parties thereafter entered into a settlement of the litigation that was ultimately reduced to a Consent Judgment. Included in the Consent Judgment were provisions creating the temporary judgeship that would be assigned to the Louisiana Supreme Court and the eventual elimination of that judgeship when the terms of the sitting justices from the First Supreme Court district expired or when one of them left the court. Id. at ¶¶ C(1-3, 5-8). The 1992 Consent Judgment also included provisions making clear that the assigned judge received the same benefits and emoluments and had the same duties and powers as the other justices:

> *The Fourth Circuit Court of Appeal Judge assigned to serve on the Supreme Court shall receive the same compensation, benefits, expenses, and emoluments of offices as now or hereafter provided by law for a justice of the Louisiana Supreme Court.*
>
> *The Fourth Circuit Court of Appeal judge assigned to serve on the Supreme Court shall participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court. Specifically, the assigned judge and the seven Supreme Court judges shall be assigned on a rotating basis to panels of seven judges, and the Court's cases shall be assigned randomly to the seven-judge panels for decision. The assigned judge and the seven Supreme Court justices shall participate fully and share equally in all other duties and powers of the Supreme Court, including but not limited to, those powers set forth by the Louisiana Constitution, the laws of Louisiana, and the Louisiana Rules of Court.*

Id. at ¶ C(4).

As stated by Marc Morial, the goal of the 1992 Consent Judgment was to reach a compromise that would enable African American voters to elect a justice of their choice, while

allowing the white incumbents to finish their terms. Moreover, the plaintiffs would not have accepted an agreement where the Chisom justice would be inferior to the other justices in any way:

> *Once the U.S. Supreme Court ruled in our favor in June 1991, we were very confident we would ultimately succeed in this litigation.... We were perfectly ready to continue the litigation to its end and to redistrict the Louisiana Supreme Court.*
>
> *However, once we won and created an Orleans-based, majority African American district, we would have created serious political problems for the two incumbent members of the Louisiana Supreme Court who were sitting in those seats. They were both elected from a now defunct majority white four parish district. Their next elections would be significantly different in terms of the places where they would run, the voters they would face, and in all likelihood the outcome would have been different. This is why the incumbent members of the Louisiana Supreme Court intervened in our case, to protect their own interests.*
>
> *Thus, a paramount reason for the consent decree expanding the Louisiana Supreme Court from seven Justices to eight was to protect the rights of those incumbent Justices while at the same time creating an Orleans Parish based district for the majority of black voters.*

In the expansion from seven justices to eight, it was always the understanding of the parties to this litigation, including the United States, which intervened into the case, that the eighth seat on the Louisiana Supreme Court was to be an absolute equal to the other seven. The eighth Justice was entitled to be treated in exactly the same way as the other seven and was a full Justice of the Louisiana Supreme Court just like the other seven in all ways. That was the whole point of the litigation. We would never have accepted a Louisiana Supreme Court Justice for Orleans Parish that was in any way at all somehow less than the other Justices. Morial Decl. ¶ 9.

By its own terms, the Consent Judgment "*constituted a final judgment of all claims raised in this action by the* <u>Chisom</u> *plaintiffs and the United States, and is binding on all parties*

*and their successors in office.*" Id. at ¶ H. Accordingly, the Plaintiffs' claims were "*dismissed with prejudice,*" Id. at ¶ G, but the Court "*retain[ed] jurisdiction over this case until the complete implementation of the final remedy has been accomplished.*" Id. at ¶ K. As discussed below, the retention of that jurisdiction was to be employed several years later, in 1994 and again in 2000, when the Court ordered an amendment to the Consent Judgment.

In addition, the Louisiana Legislature passed Act No. 512 (1992) ("Act 512"). Ex. G. Act 512 contained many of the same substantive provisions as the 1992 Consent Judgment, such as the creation of the Chisom seat that was assigned to the Supreme Court, and the fact that the judge "*shall participate equally in the cases and duties of the supreme court*" and "*shall receive the same compensation, benefits, expenses, and emoluments of office*" as the justices on the Louisiana Supreme Court. Id. at 2. By its own terms, Act 512 would not become effective unless the federal court ordered the Chisom Consent Judgment into effect. Id. at 3.

The term of office of the first Chisom Justice, Revius Ortique, began on January 1, 1993. Justice Ortique turned seventy in 1994, and under the law at the time, had to take mandatory retirement.[3] Bernette Johnson won election to replace Justice Ortique, and since taking office on October 3, 1994, has served continuously on the Supreme Court, winning reelection most recently in 2010. Johnson Decl. ¶ 4-5, Ex H. Jeffrey Victory began his service on the Louisiana Supreme Court in January 1995. Since Justice Victory has been on the Supreme Court, he has taken the position that he is senior to Justice Johnson because she was assigned to the Supreme Court pursuant to the Consent Judgment. Johnson Decl. ¶ 7, Ex. H.

In 1997, a Louisiana resident, Clement Perschall, brought an action alleging that Act 512 violated the Louisiana Constitution because it created an eighth justice on the Louisiana Supreme

---

[3] The law has changed so that a justice can complete their existing term when they turn seventy but cannot start a new term. La. Const. Art 5. § 23(b).

Court. Perschall v. Louisiana, 697 So. 2d 240 (La. 1997). The Louisiana Supreme Court chose to decide the issue. Chief Justice Calogero and Associate Justices Johnson and Marcus were recused and replaced by two appellate judges. In a decision authored by then-Associate Justice Kimball, and joined by Justices Victory and Knoll, the Louisiana Supreme Court held that Act 512 violated the Louisiana Constitution because it created an eighth justice on the Louisiana Supreme Court:

> *It is apparent from a plain reading of [Act 512] that the legislature was attempting to effectuate an immediate remedy of alleged voting rights violations by providing a majority-minority appellate court district, with concomitant assignment of the duly elected judge to the supreme court, to serve in the full capacity of a justice during the period assigned. We recognize this course of action was undertaken in good faith to effectuate a remedy least injurious to the institution, at a point in time when the jurisprudence was in transition. However, [Act 512's] implementation effectively created an eighth position on this court, implicating state constitutional concerns. While meant to be temporary, [Act 512] has administered a process that we must find is constrained by article V, section 3's numerative limit.*

Id. at 259. Nonetheless, the Louisiana Supreme Court recognized that they were bound by the authority of the Consent Judgment and that the creation of the eighth Supreme Court Justice pursuant to the Consent Judgment could not be affected by its decision:

> *We realized that Act 512 does not exist in a vacuum. The State argues, and we agree, the Act and the Chisom Consent Judgment are separate and independent methods by which the negotiated remedy was implemented. Although the Act falls by this judgment, we recognize the status quo remains intact under the Chisom Consent Judgment. Consequently, this court as it is currently composed shall continue to function as a de jure court with its actions valid and effectual. We emphasize that the court-approved settlement in Chisom, which is under the jurisdiction of the United States District Court for the Eastern District of Louisiana, is not affected by this judgment.*

Id. at 260.

Nine days after the Louisiana Supreme Court issued the Perschall decision, the Governor approved Louisiana Act No. 776 (1997) ("Act 776"), Ex. I. Act 776 adjusted the reapportionment timeline, enhanced retirement benefits available for certain state court judges, and clarified that when the last Chisom judge took office as a regularly elected judge from the New Orleans Parish district, the Chisom seat would be abolished. In addition, Act 776 explicitly states that any Chisom judge would receive credit for his or her "tenure," or period of service in that seat: "*Any tenure on the supreme court gained by the [Chisom] judge while so assigned to the supreme court shall be credited to such judge.*" Act 776, Section 2(B).

The amendments made by Act 776 were incorporated into the 1992 Consent Judgment as a modification of and addendum to that judgment. The parties moved for an Order that was signed by Judge Schwartz on January 3, 2000. The Order states:

> *Considering the consent of all parties herein to amend the Consent Judgment of August 21, 1992 to reflect the intent of the parties to accept Louisiana Acts 1997, No. 776 as compliance with the mandates of said consent judgment.*
>
> *IT IS HEREBY ORDERED that Louisiana Acts 1997, No. 776 be and is hereby added as an addendum to the Consent Judgment in Civil Action No. 86-4075, Chisom et al. v. Edwards, et al.*

Joint Motion to Amend Consent Judgment and Order, Dkt. 135 at 7, and Ex. C. Upon Chief Justice Calogero's retirement, Justice Kimball was elevated to Chief Justice in 2009. Other than Chief Justice Kimball, Justice Johnson has the longest tenure on the Louisiana Supreme Court. As the second most senior Justice, Justice Johnson assumed the Chief Justice's duties when Justice Kimball suffered a stroke in 2010. Such duties included, but were not limited to: (1) convening and presiding over oral arguments, (2) presiding over administrative and writ conferences, and (3) supervising judicial and administrative staff. Johnson Decl. ¶13-15. None

of the Justices objected to Justice Johnson serving as Acting Chief Justice during Justice Kimball's absence. Johnson Decl. ¶ 13-15.

Chief Justice Kimball tendered a letter of retirement to Louisiana Secretary of State, Jerry Schedler, pursuant to La. Rev. Stat. § 18:652 on May 8, 2012. Chief Justice Kimball's retirement from the Court becomes effective January 31, 2013. Johnson Decl. ¶ 16. Shortly thereafter, Chief Justice Kimball asked if Justice Johnson was willing to meet with her and Justice Victory to discuss who would become the next Chief Justice. Justice Johnson responded that she is senior in terms of service on the Court and that she should be the next Chief Justice. Chief Justice Kimball suggested that Justice Victory should be Chief Justice beginning January, 2013 until the end of his term in December, 2014. Thereafter, Justice Knoll would be Chief Justice until the end of her term in 2016, and Justice Johnson would become Chief Justice in January, 2017.

On the morning of June 12, 2012, Justice Johnson transmitted a letter via email notifying the court employees that since the State's Constitution declares *"the judge oldest in point of service on the Supreme Court shall be chief justice"* that she would be establishing a transition team and scheduling meetings with each Department Head to discuss the operations at the Court in anticipation of Justice Kimball's retirement. On the afternoon of that same day, June 12, 2012, at the Supreme Court's administrative conference, Justices Kimball, Victory, Knoll, Weimer, Guidry and Clark attempted to invoke a discussion of who would become Chief Justice. Justice Johnson announced that the Justices had no authority to select or elect a Chief Justice. Justice Johnson then exited the conference.

The next day Chief Justice Kimball issued an Order, which states that:

> *[C]ontrary legal positions have been expressed on the issue of who will succeed to the office of Chief Justice of the Louisiana Supreme*

> *Court upon the retirement of present Chief Justice Catherine D. Kimball on January 31, 2013. And further considering that the administration of justice requires a legal determination of who will assume the position of Chief Justice on February 1, 2013.*

The Order further provides that:

> *[a]ny sitting Justice interested in a legal determination of this matter may file with the Clerk of Court, no later than July 31, 2012, on the following issue: In consideration of Chief Justice Catherine D. Kimball's retirement on January 31, 2013, for purposes of determining who is Chief Justice of the Louisiana Supreme Court as of February 1, 2013, which Justice is the "judge older in point of service on the supreme court" under Article V, Sec. 6 of the Louisiana Constitution of 1974.*
>
> *Factual matters, if any, shall be submitted by affidavit filed with the Clerk of Court no later than July 31, 2012. Any responses by a sitting Justice shall be filed with the Clerk of Court by August 15, 2012. This matter shall be assigned for written opinion.*

*In re: Office of Chief Justice, Louisiana Supreme Court*, No. 12-O-1342 (June 13, 2012)("June 13") Order, Ex. J. Justice Victory recused himself and Justices Johnson and Knoll were deemed recused. The Chief Judges from the First, Second, and Third Circuit Courts of Appeal have been assigned to the matter. Id. The chief judge of the Fourth Circuit, Justice Johnson's circuit, was not assigned to the matter whereas the chief judges from the circuits of Justice Victory (Second) and Judge Knoll (Third) were assigned. *In re: Office of Chief Justice, Louisiana Supreme Court*, No. 12-O-1342 (June 13, 2012)("June 13") Order, Ex. J

### III. ARGUMENT

#### A. Federal Courts Have the Authority to Enforce Their Own Orders and Judgments.

It is well established that a federal court has the inherent authority to enforce its own orders and judgments. Kokkonen v. Guardian Life Insurance Co. of Amer., 511 U.S. 375, 379-80 (1994); see also Waffenschmidt v. Mackay, 763 F.2d 711, 716 (5th Cir. 1985) ("*Courts possess the inherent authority to enforce their own injunctive decrees.*"); Kokkonen, 511 U.S. at

378-80 (explaining that the doctrine of ancillary jurisdiction or inherent power, *"recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them."*). Courts have asserted this inherent authority (also referred to as inherent power or ancillary jurisdiction) to protect the effect and force of their decrees or to promote the interests of justice and fairness. Id. at 380 (ancillary jurisdiction may be asserted *"to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees)*; Trade Arbed, Inc. v. African Express MV, 941 F. Supp. 68, 70 (E.D. La. 1996)(relying on such jurisdiction to reopen the case on plaintiff's F.R.C.P. 60(b)(6) motion based on breach of settlement agreement).

The fact that a case is no longer active does not deprive a court of its power to enforce the terms of a judicial order that served as the basis for closing the original action. Under Kokkonen, where there is a settlement agreement and order providing that includes a dismissal of claims, a party can later petition the court to reopen the case and enforce the settlement agreement if the order (1) expressly retains jurisdiction over the original case, or (2) incorporates the terms of the settlement agreement into the order. Kokkonen, 511 U.S. at 381; Hospitality House, Inc. v. Stonebridge Health Center, Inc., 298 F.3d 424, 433 (5th Cir. 2002); Trade Arbed, Inc., 941 F.Supp. 68.

In Ho v. Martin Marietta Corp., 845 F.2d 545, 546 (5th Cir. 1988), the plaintiff resolved his Title VII employment discrimination case through a settlement agreement that was entered as a judgment. A few months later, after the plaintiff filed a worker's compensation claim based on the same issues as his Title VII claim, the defendant moved to have the case reopened and the settlement agreement enforced. The district court granted the defendant's motions. Id. at 547.

The Fifth Circuit affirmed, holding that the district court properly exercised its power to enforce its own judgment:

> *Once the district court enters the settlement as a judicial consent decree ending the lawsuit, the settlement takes on the nature of a judgment. The judicial decree, which gives the settlement its legal force, cannot be collaterally attacked or altered.* Thaggard v. City of Jackson, *687 F.2d at 68. It "is a final determination and res judicata of the merits...." 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice p.409 [5] at 326 (2d ed. 1984). Federal courts, of course, may issue injunctions to prohibit the parties from relitigating claims settled by the consent decree, just as they may protect the finality of any of their judgments. 28 U.S.C. Sec. 2283. . . . Consequently, the district court's decision to discourage Ho's worker's compensation claim was not a novel attempt to usurp the exclusive jurisdiction of a state court system over a state claim, but rather a common exercise of a federal court's right to protect its own final judgments.*

Id. at 548-49.

In this case, the Court explicitly retained jurisdiction over the case *and* expressly incorporated the terms of the settlement agreement into the consent judgment. Indeed, the Court previously exercised its retention of jurisdiction in amending the consent decree in 2000 to incorporate Act 776.

Moreover, there is strong support for the court to exercise its inherent authority to reopen the case now to enforce the Consent Judgment. The relief Justice Johnson requests is analogous to that in Ho. By raising the issue of whether Justice Johnson's years as the Chisom justice count towards her seniority, and placing itself as the decision maker of whether they do, the Louisiana Supreme Court is re-litigating an issue that was resolved by the parties and ordered by this Court in the Consent Judgment. The 1992 Consent Judgment, at paragraph C-3 states that the Chisom judge "*shall receive the same compensation, benefits, expenses, and emoluments of office as are now or as may hereafter be provided by law for justices of the Louisiana Supreme*

*Court.*" Further, the 1992 Consent Judgment, at paragraph C-4, provides that this judge assigned to serve on the Supreme Court, "*shall participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court.*" Additionally, the 2000 amendment to the Consent Judgment, through its incorporation of the Act 776, explicitly states that the Chisom justices shall be credited for years served as the Chisom Justice for tenure purposes. There is no doubt that under the Consent Judgment, Justice Johnson's years as the Chisom Justice count as years of service on the Louisiana Supreme Court-the Consent Judgment states repeatedly that the Chisom judge is equal in all respects to the other justices, and furthermore, there is no explicit or implicit suggestion that the Chisom judge was inferior to the other justices. Therefore, the Court needs to exercise its jurisdiction here to protect its own final judgment.

    B.    **The United States District Court for the Eastern District Court of Louisiana is the only court where violations of the court's Consent Judgment can be redressed.**

Without any pending case or controversy, Chief Justice Kimball issued an order purporting to initiate proceedings in the Louisiana Supreme Court to adjudicate the issue of which Justice was the "*judge oldest in point of service on the supreme court*" for the purpose of determining who would succeed her as Chief Justice. The order claims that the court's authority to initiate this original adjudication is Louisiana Constitution Article V. However, the order makes no reference to which of Article V's thirty-four (34) sections purportedly give this authority. Section 5(B) of Article V entitled "Original Jurisdiction" governs the original jurisdiction of the Louisiana Supreme Court. It states, "*The Supreme Court has exclusive original jurisdiction of disciplinary proceedings against a member of the bar.*" Article V does not enumerate any other matters over which the Supreme Court has original jurisdiction. The Louisiana Supreme Court has explained that its original jurisdiction begins and ends with

attorney disciplinary matters and that the district courts have original jurisdiction to adjudicate "*all legal matters, both civil and criminal.*" See, Moore v. Roemer, 567 So. 2d 75, 79 (La. 1990). To the extent there is an inclination to argue that the Supreme Court's current Chief Justice controversy falls outside of this mandate, the Louisiana Supreme Court has also made it clear that, "*this terminology (regarding the district court's original jurisdiction) indicates an intent by the drafters to include all matters not criminal in nature as civil matters under the district court's original jurisdiction. Nothing in the constitution suggests any intent that a separate category of innominate matters should be excluded from these all-inclusive terms.*" Id. (emphasis added). As the Supreme Court has been saying since the 19th century, "*the Supreme Court has not original jurisdiction to determine questions of fact in the first instance.*" Elton v. Temple, 21 La. Ann. 502 (La. 1869); Succession of King, 21 La. Ann. 502 (La. 1869); Succession of Tauzin, 21 La. Ann. 536 (La. 1869).

Moreover, by declaring Act 512 unconstitutional in Perschall, the Louisiana Supreme Court divested itself of any authority it may have regarding the terms by which the Chisom judge served. Indeed, the Louisiana Supreme Court found that there is no legal basis for the Chisom seat under Louisiana law **because** the Chisom judge was serving in the "*full capacity as a justice*" that "*effectively created an eighth position*" on the Court in violation of the Louisiana Constitution. Perschall, 697 So. 2d 240 (La. 1997). The Louisiana Supreme Court cannot undue its previous determination. As a result, the legal basis for the position that the Chisom judge's years of service should count for seniority purposes is necessarily one of federal law, not state law.

For these reasons, the Supreme Court has no authority to self-initiate an original adjudication of the Chief Justice controversy -- particularly when an existing federal court

Consent Judgment is the prevailing authority that governs this determination. Therefore, the United States District Court for the Eastern District of Louisiana, the forum where the consent judgment was entered, is the only court where the Orleans Parish voters, Intervenors, and the United States of America can seek redress for the defendants' violation of the consent judgment they entered into.

  C. **The Six Other Louisiana Supreme Court Justices Should Be Joined as Defendants**

Rule 19(a)(1)(A) of the Federal Rules of Civil Procedure sets forth the circumstances in which joinder is required:

> *(1) Required Party. A person who is the subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction must be joined as a party if:*
>
> > A. *in that person's absence, the court cannot afford complete relief among existing parties.*

Fed. R. Civ. P. 19(a)(1)(A). Chief Justice Catherine Kimball and Justices Greg Guidry, Marcus Clark, and John Weimer participated in the decision during the June 12, 2012 administrative conference to issue the constitutionally unauthorized June 13, 2012 Order. Also, Justices Kimball, Guidry, Clark, and Weimer constitute a majority of the court who are attempting to decide the Chief Justice succession issue – albeit without jurisdiction to do so. Regarding Justices Victory and Knoll, they have refused to acknowledge Justice Johnson's seniority to them as provided by the Consent Judgment. It appears necessary to join these six Justices to afford complete relief since they are the individuals who have taken action either by initiating litigation at the Supreme Court level to address the Chief Justice controversy (Justices Kimball, Guidry, Weimer and Clark) or by refusing to acknowledge that Justice Johnson's tenure as the <u>Chisom</u>

Justice shall be credited to her pursuant to the Consent Judgment. Moreover, the six Justices are subject to service of process as the Louisiana Supreme Court is located in New Orleans and adding the six Justices as defendants will not affect subject matter jurisdiction because it is based on a federal question and not diversity.

### D. Kimball, Weimer, Guidry, and Clark Should Be Held In Contempt for Violating the Consent Judgment

A motion for contempt is the appropriate vehicle to seek enforcement of a consent decree. Green v. McCaskle, 788 F.2d 1116, 1123 (5th Cir. 1986). *"To prove civil contempt, a movant must show that (1) the alleged contemnor had notice of the order; (2) 'the order was clear and unambiguous'; (3) the alleged contemnor 'had the ability to comply with the order'; and (4) the alleged contemnor violated the order."* Hawkins v. Dept. of Health and Human Services, 665 F.3d 25 (1st Cir. 2012) (quoting United States v. Saccoccia, 433 F.3d 19, 27 (1st Cir. 2005).

All four prerequisites are satisfied here. First, the Justices undisputedly have notice of the Consent Judgment. Second, as discussed above, the Consent Judgment is clear and unambiguous in stating that Justice Johnson's time as the Chisom justice is credited to her in determining her seniority. Third, the Louisiana Supreme Court could have complied with the Consent Judgment by simply acknowledging that Justice Johnson was the next in line to become Chief Justice. Fourth, the four members of the Louisiana Supreme Court who signed or joined the June 13 Order have acted in contravention of the Consent Judgment by self-initiating original litigation in the Supreme Court to determine the issue of whether Justice Johnson's years as the Chisom judge should count as years of service on the Louisiana Supreme Court.

## III. CONCLUSION

For the reasons stated above, Plaintiff-Intervenor Bernette Johnson respectfully request that the Court reopen this action, join Louisiana Supreme Court Justices Kimball, Victory, Knoll, Weimer, Guidry, and Clark as defendants, and find Justices Kimball, Weimer, Guidry, and Clark in contempt for the purpose of stopping the course of action set forth in the June 13 Order.

Dated: July 5, 2012.

Respectfully submitted:

GAUTHIER, HOUGHTALING
& WILLIAMS, LLP

BY: _____
JAMES M. WILLIAMS, BAR NO. 26141
ALANAH O. HEBERT, BAR NO. 31904
3500 N. Hullen Street
Metairie, Louisiana 70002
504-456-8600 (o)
504-456-8624 (f)


CLARENCE ROBY, JR. BAR NO. 20345
**LAW OFFICE OF CLARENCE ROBY, JR.**
3701 Canal Street, Floor 4, Suite U
New Orleans, Louisiana  70119
504-486-7700 (o)
504-486-8005 (f)

TRACIE WASHINGTON, BAR NO. 25925
**LOUISIANA JUSTICE INSTITUTE**
1631 Elysian Fields Avenue
New Orleans, Louisiana 70117
504-872-9134 (o)
504-872-9878 (f)
tlwesq@cox.net
tracie@LouisianaJusticeInstitute.org

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon counsel for all parties via facsimile transmission, electronic mail, hand delivery, or by placing same in the U.S. Mail, postage prepaid and properly addressed, this 5th day of July, 2012.

_____
JAMES M. WILLIAMS