## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF LOUISIANA

Ronald Chisom, *et al.*,

Plaintiffs,

v.

Civil Action No. 86-cv-4075 (SM)(SS)

Bobby Jindal, *et al.*,

Defendants.

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISSOLVE CONSENT DECREE

Plaintiffs Ronald Chisom and Marie Bookman,[1] and prospective Plaintiff the Urban League of Louisiana, (collectively, "**Plaintiffs**"), by and through their undersigned counsel, respectfully submit this memorandum of law in opposition to the Motion to Dissolve Consent Decree pursuant to Rules 60(b)(5) and (6) of the Federal Rules of Civil Procedure submitted by the State of Louisiana, through Jeff Landry, in his official capacity as the Attorney General of the State of Louisiana ("**Defendant**" or the "**State**").

## PRELIMINARY STATEMENT

This historic and groundbreaking case—originally filed more than thirty-five years ago—is taught in law schools in Louisiana and around the country.  It has its roots in Louisiana's long history of discrimination in the judicial branch.  It has involved years of hard-fought litigation, including multiple appeals to the Fifth Circuit and an appeal to the United States Supreme Court.

---

[1]      On February 8, 2022, Plaintiffs Ronald Chisom and Marie Bookman submitted a motion requesting that this Court add the Urban League of Louisiana as a plaintiff in this action, and drop Walter Willard, Marc Morial, Henry A. Dillon, III, and the Louisiana Voter Registration/Education Crusade as plaintiffs in this action pursuant to Rule 21.  While the Court has not yet ruled on this motion, the Urban League of Louisiana fully adopts this Opposition as its own and intends to fully participate in this action if Plaintiffs' motion is granted.

It led to this Court's entry of an historic Consent Decree that—among other things—ordered the development of a State Supreme Court District (the Seventh Supreme Court District) that provides Black citizens in and around Orleans Parish the opportunity to elect a candidate of their choice to the State's highest court *for the first time*.  Then and now, that district is the only one on the Louisiana Supreme Court that provides Black Louisianans an equal opportunity to elect their preferred justices.  The State now asks this Court—without factual or legal support—to wipe this slate clean with the stroke of a pen and without any assurance that a new, undisclosed map will not snatch away Black Louisianans hard-won opportunity to participate in these elections equally. This Court should reject the State's motion.

The State does not come close to satisfying its burden of demonstrating that the remedy it seeks—the complete dissolution of the Consent Decree—is warranted.  The State presents no evidence of changed circumstances that would support disturbing the decree.  The State has not shown that the fundamental purpose of the Consent Decree has been satisfied.  The State has not even attempted to show that, absent the Consent Decree, there would be no repeat violation of rights guaranteed by the Voting Rights Act or the Constitution.  And the State's claim that it needs to dissolve the Consent Decree to address "malapportionment" of Supreme Court Judicial Districts is unsupported and legally wrong.  Indeed, the Consent Decree explicitly allows the Supreme Court Judicial Districts to be redrawn to correct for population changes.  The only requirement is that the Seventh Supreme Court District be preserved as a district that provides Black voters in and around Orleans Parish the opportunity to elect their preferred candidates to the Supreme Court. But the State has never made use of this authority.  Instead, the State has left these districts malapportioned for years, belying its current claims of "urgency" for reapportioning the Supreme Court Districts.  In fact, Louisiana's Supreme Court Districts are *less* malapportioned today than

they were after the 2010 Census.  And, in any event, the federal case law (including an affirmance by the Supreme Court) is clear that there is no legal obligation to reapportion judicial districts for malapportionment.  The State has also failed to come forth with any evidence that the remedy it seeks—the complete dissolution of the Consent Decree—is "suitably tailored" to address whatever alleged impact any alleged changes in circumstances might require.

These deficiencies are enough to require that the State's motion be denied as a matter of law.  But even if the State had *some* real evidence of changed circumstances, in order for the State to prevail, the Court would have to conduct an evidentiary hearing during which both sides could present evidence (including, presumably, expert evidence), and the State would still bear the burden of persuasion.  Here, however, the State has failed to make even a threshold showing that would justify such a hearing, relying instead on arguments that amount to little more than shadow puppets and "say-so."  Its cavalier attempt to disrupt the Consent Decree should be roundly rejected.

## PROCEDURAL HISTORY & FACTUAL BACKGROUND

In 1986, individuals Ronald Chisom, Marie Bookman, Walter Willard, Marc Morial, and Henry A. Dillon, III, along with nonprofit voter education group Louisiana Voter Registration/Education Crusade, (the "**Original Plaintiffs**"), filed a class action complaint against three Louisiana officials in their official capacities, claiming that the multimember district system for electing judges of the Louisiana Supreme Court in the First Supreme Court District diluted Black voting strength in violation of Section 2 of the Voting Rights Act ("Section 2").  *See Chisom v. Jindal*, 890 F. Supp. 2d 696, 707 (E.D. La. 2012).  At the time, "no black person ha[d] ever been elected to the Louisiana Supreme Court, either from the First Supreme Court District or from any one of the other five judicial districts."  *Chisom v. Edwards*, 839 F.2d 1056, 1057-58 (5th Cir. 1988).

3

After six years of litigation, which included numerous appeals to the Fifth Circuit and one appeal to the United States Supreme Court,[2] the parties entered into a Consent Decree, which was signed by U.S. District Judge for the Eastern District of Louisiana Charles Schwartz on August 21, 1992 (the "**Consent Decree**").   Consent Decree at 8, ECF No. 257-4.   The Consent Decree seeks to address and resolve the claims raised by the Original Plaintiffs, which it summarizes as follows:

> The Chisom plaintiffs and the United States claim that the multimember district system for electing justices of the Louisiana Supreme Court in the First Supreme Court District [first district] dilutes black voting strength in violation of Section 2 of the Voting Rights Act of 1965 as amended, 42 U.S.C. 1973 [Section 2], because black citizens have less opportunity than other members of the electorate to participate in the political process and elect justices of their choice.

Consent Decree at 1-2, ECF No. 257-4.   The Consent Decree further states that "[t]he Chisom plaintiffs and the United States contend that the provisions contained . . . in this Consent Judgment are necessary to bring the system for electing the Louisiana Supreme Court into compliance with Section 2."   Consent Decree at 2, ECF No. 257-4.   Defendants conceded that "they believe[d] that the relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act."   *Id.*   The Consent Decree then states that, because "the parties to this litigation desire to effect a settlement of the *issues raised by the complaint and subsequent proceedings* without the necessity of further litigation" that the parties "consent to the entry of the following final and binding judgment as dispositive of *all issues raised in this case*."   *Id.* at 3-8 (emphasis added).   The Consent Decree then provides an overview of the actions that must be taken to effect its terms.   *Id.*

---

[2]     One of these appeals, *Chisom v. Roemer*, occasioned the Supreme Court's landmark ruling that Section 2 applies to judicial elections.   *See* 501 U.S. 380, 402 (1991).

Most critically, the Consent Decree lays out a comprehensive procedure to ensure that Black voters anchored in Orleans Parish have an equal opportunity to participate in the political process and to elect candidates of their choice. *Id.* at 7. The Consent Decree effectuates this goal by providing for both interim and forward-looking relief. To provide an immediate remedy when it went into effect, the Consent Decree provided for the temporary addition of an eighth Justice to the Louisiana Supreme Court, elected from Louisiana's Fourth Circuit Court of Appeals, which was comprised of Orleans Parish, to serve until such time as a new Justice took office under a new Supreme Court plan. *Id.* at 3. Under the Consent Decree's terms, the Justice in this temporary eighth seat "shall participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court" pursuant to "the Louisiana Constitution, the laws of Louisiana, and the Louisiana Rules of Court." *Id.* at 4.

The Consent Decree also calls for measures to prevent violations of Section 2 in *future* election cycles. When it was adopted, the Consent Decree required the Louisiana legislature to enact legislation that "provides for the reapportionment of the seven districts of the Louisiana Supreme Court in a manner that complies with the applicable federal voting law, taking into account the most recent data available," including, in particular, "a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety" and would become effective on January 1, 2000. *Id.* at 6. The Consent Decree states that "future Supreme Court elections after the effective date shall take place in the newly [seven single-member] reapportioned districts." *Id.* And the Consent Decree provides that "[t]he Court shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished." *Id.* at 8.

The legislation called for by the Consent Decree—codified as House Bill No. 581, 1997 Reg. Sess. (La. 1997) (hereinafter "**Act 776**")—was signed into law on July 10, 1997, and became effective on January 1, 1999.[3]  On January 3, 2000, the parties amended the Consent Decree to incorporate that legislation "as an addendum to the Consent Judgment," and Judge Schwartz signed that amendment that same day.[4]  *See* Am. Consent Decree at 3, ECF No. 257-5.  In doing so, the Consent Decree explicitly incorporated the portions of Act 776 that allow the State to redistrict the Supreme Court districts in future years, provided that it conform to the terms of the Consent Decree when it did so.  *See* Act 776 § 101.1(E) ("[t]he legislature may redistrict the supreme court following the year in which the population of this state is reported to the president of the United States for each decennial federal census.").

Since the entry of the Consent Decree, three justices have held the seat created by the *Chisom* litigation:[5] Justice Revius O. Ortique Jr., Justice Bernette J. Johnson and Justice Piper D. Griffin.  Justice Johnson was sworn into the Louisiana Supreme Court in the *Chisom* seat on November 16, 1994, following Justice Ortique's retirement.  On October 7, 2000, Justice Johnson was elected as an Associate Justice for the Seventh Supreme Court District (the district established by the legislation called for in the Consent Decree), and served in that role until her retirement in 2020.  Justice Piper D. Griffin was subsequently elected to fill the Seventh District seat.

---

[3]      *See* H.B. 581: History, 1997 Reg. Sess. (La. 1997) https://www.legis.la.gov/legis/BillInfo.aspx?s=97RS&b=HB581&sbi=y (last visited on Feb. 1, 2022).

[4]      The map that was adopted in Act 776 did not ultimately include Orleans Parish in its entirety, but did provide for a district comprised of a majority of Black voters that included most of Orleans Parish, and was incorporated as an addendum to the Consent Decree with consent of all parties.

[5]      The term "*Chisom* seat" has occasionally been used to refer to both the temporary eighth Supreme Court seat that was in place from 1994 to 2000, and the single-member Supreme Court District based in Orleans Parish created by Act 776.  For the sake of clarity, this memorandum refers to only the temporary eighth seat created by the Consent Decree as the "*Chisom* seat," and refers to the seat based in Orleans Parish under the current Supreme Court map as the "Seventh Supreme Court District" or "Seventh District."

During Justice Johnson's tenure, the State challenged whether the time she served on the Louisiana Supreme Court in the *Chisom* seat should be credited toward her total tenure for purposes of determining the Supreme Court's next Chief Justice. *See Chisom*, 890 F. Supp. 2d at 701. In finding that it should, this Court concluded that it retained jurisdiction over enforcing the Consent Decree because "there has been no affirmative ruling by this Court that this Consent Judgment has been completely satisfied and thus has been vacated or terminated" and, accordingly, the "final remedy" contemplated by the Consent Decree had not been achieved. *Id.* at 711, 721. Following that decision, Justice Johnson was sworn in as Chief Justice of the Louisiana Supreme Court on February 1, 2013, and served with distinction in that role until her retirement on December 31, 2020. The State made no motion to modify or dissolve the Consent Decree at the time of the tenure dispute in 2012-13 (or in the near decade that followed), and the Consent Decree, which includes agreed-upon language about *future* elections, remains in place.

On December 2, 2021, the State filed the Motion to Dissolve Consent Decree pursuant to Rules 60(b)(5) and (6) of the Federal Rules of Civil Procedure now before the Court. The State argues that "the Consent Decree accomplished what it intended to accomplish, and the final remedy has been implemented" relying solely on dicta in a recent Fifth Circuit opinion, *Allen, et al. v. State of Louisiana, et al.*, 14 F.4th 366, 374 (5th Cir. 2021). *See* Mot. to Dissolve Consent Decree ("**Def.'s Mot.**") at 1, ECF No. 257. The State further argues that Louisiana's Supreme Court districts are "severely malapportion[ed]," and that the Consent Decree must be dissolved to address that malapportionment. *Id.* at 6-7. For the reasons stated more fully below, the State's arguments are baseless and do not even come close to satisfying the State's hefty burden of proof for modifying or dissolving consent decrees under Rule 60(b).

**LEGAL STANDARD**

A motion to dissolve or otherwise modify a consent decree is, like other attempts to alter an injunction entered by a federal court, controlled by Federal Rule of Civil Procedure 60(b).  Fed. R. Civ. P. 60(b); *LULAC, Dist. 19 v. City of Boerne*, 659 F.3d 421, 437 (5th Cir. 2011).  In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 (1992), the Supreme Court established a two-part test for Rule 60(b) motions to alter institutional reform decrees like the one at issue here. Under the *Rufo* test, the party seeking to disturb the decree must first "establish[] that a significant change in facts or law warrants revision of the decree," and second must demonstrate that "the proposed modification is suitably tailored to the changed circumstances."  *Rufo*, 502 U.S. at 383.

As the Fifth Circuit has emphasized, the burden imposed by the *Rufo* test rests on the party making the motion.  "[T]he party seeking modification must show that the change in circumstance is 'significant,' and not merely that 'it is no longer convenient to live with [the decree's] terms.'" *Boerne*, 659 F.3d at 437 (quoting *Rufo*, 502 U.S. at 383) (second alteration in original).  Moreover, the moving party must meet that burden by the production of record evidence, "regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely."  *Id.* at 438 (citing *Rufo*, 502 U.S. at 384).  Thus, whenever a court reviews a Rule 60(b) motion to diminish, disturb, or dissolve a consent decree, it "must therefore examine the evidence on the record and consider whether the moving party met its burden."  *Id.*

In the context of a motion to remove or modify a consent decree that resolves a voting rights violation, the showing of a "significant" change in circumstances necessarily involves a demonstration that the circumstances from which the violation arose have abated.  Thus, where, as here, a consent decree resolves claims of racial vote dilution under Section 2, the moving party's burden of proof requires a showing that the underlying conditions as defined by the Supreme Court

in *Thornburg v. Gingles*, 478 U.S. 30 (1986), are no longer present.  *See NAACP v. City of Thomasville*, 401 F. Supp. 2d 489, 502 (M.D.N.C. 2005) (engaging in the "searching practical evaluation" of underlying electoral conditions demanded by *Gingles* in the course of reviewing a motion to dissolve a consent decree that resolved Section 2 voting dilution claims (*quoting Gingles*, 478 U.S. at 45)); *cf. Boerne*, 659 F.3d at 439 (describing the factual information absent from the record that could have supported modification of a vote dilution consent decree, including the history of "which candidates the protected class tended to support . . . or what the outcomes of those elections were").

## <u>ARGUMENT</u>

The State has failed to satisfy its burden of demonstrating that the remedy it seeks—complete dissolution of the Consent Decree—is warranted at either prong of the *Rufo* test.

*First*, the State has failed to present evidence demonstrating a "change in circumstances" that would support disturbing the Consent Decree.  Specifically, the State has not produced any evidence that the fundamental purpose of the Consent Decree has been satisfied.  Additionally, the State's purported concerns about "malapportionment" are untenable, because the Consent Decree is not an obstacle to correcting malapportionment.  The Consent Decree, as amended to incorporate Act 776, explicitly contemplates that judicial districts may be redrawn to correct for population changes, so long as the Seventh Supreme Court District is preserved as a district that provides Black voters in Orleans Parish with the opportunity to elect their preferred candidates to the Supreme Court.  And, in any event, there is neither any legal obligation nor particular urgency to reapportion judicial districts; Louisiana's Supreme Court Districts have been malapportioned for at least 20 years without redistricting—indeed they were even more severely malapportioned following the 2010 Census than they are today.

*Second*, the State has failed to present any evidence that termination is "suitably tailored" to address the alleged impact that the alleged changes in circumstances have had on the Consent Decree's enforcement.  Accordingly, the State's motion should be denied in its entirety.[6]

I.     **The State Has Not Established That A Significant Change in Facts or Law Warrants Dissolution of the Consent Decree.**

In its three-page argument, the State claims that two "changed circumstances" warrant terminating the Consent Decree:  (1) the alleged fulfillment of the "final remedy" of the Consent Decree, Def.'s Mot. at 7-8, 11-12; and (2) demographic changes in Louisiana that have resulted in "severe malapportionment" throughout "the districts frozen by the *Chisom* Consent Decree," Def.'s Mot. at 8-9, 10-11.  But the State forgot to include support for its claims that these alleged "changed circumstances" warrant the drastic relief it seeks: dissolving the Consent Decree and threatening the destruction of the Seventh Supreme Court District.  The State's motion should therefore be denied.

A.     **The State Presents No Evidence That the "Final Remedy" of the Consent Decree Has Been Fulfilled.**

As an initial matter, the State fails to identify the "final remedy" of the Consent Decree, let alone demonstrate how it has been fulfilled.  It does nothing to address the conditions from which the underlying Section 2 violations that occasioned this litigation arose, nor does it present evidence that Black voters in Orleans Parish would no longer suffer vote dilution in the absence of the Consent Decree.  In fact, what evidence exists supports precisely the contrary conclusion—

---

[6]     At minimum, the Court should request further briefing based on evidence (including expert evidence) and, ultimately, hold an evidentiary hearing to determine whether modification or termination of the Consent Decree is warranted pursuant to Rule 60(b), with the State bearing the heavy burden of proof on this question.  *See Boerne*, 659 F.3d at 438-39 (reversing modification of consent decree where the district court did not request supplemental evidence or hold a hearing); *see also Thomasville*, 401 F. Supp. 2d at 498-502 (resolving a Rule 60(b)(5) motion to dissolve a consent decree in a Section 2 vote dilution case only after considering extensive evidence adduced at a hearing, including key evidence of the continued existence of racially polarized voting).

that is, the available evidence suggests that the Black voters of Orleans Parish would again risk a Section 2 violation if the Consent Decree were dissolved.  Instead, the State appears to rest its argument solely on dicta in the Fifth Circuit's recent decision in *Allen*, which affirmed the denial of the State of Louisiana's motion to dismiss, on jurisdictional grounds, voting rights claims relating to the other Louisiana Supreme Court voting districts.  Reviewing the Fifth Circuit's dicta relating to the Consent Decree in context reveals that—on its face—it is not controlling, and does not reach the conclusions the State urges; indeed the *Allen* decision contradicts some of the main arguments that the State proffers here.

1.      **The State Has Failed to Present Any Evidence That the Purpose of the Consent Decree Has Been Satisfied.**

The Consent Decree's purpose is clear on its face, and the State has presented no arguments or evidence that such purpose has been achieved.  The Consent Decree states that its purpose is "ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act" in "future Supreme Court elections" in light of "the issues raised by the complaint and subsequent proceedings" in this case.  Consent Decree at 2, ECF No. 257-4.  The complaint sought to remedy the inability of Black voters to participate in the political process and elect candidates of their choice to the Supreme Court, which was a direct result of the State's failure to provide any majority-Black single-member districts, combined with the existence of racially polarized voting[7] and evidence demonstrating an inequality of opportunity for Black voters to participate in the political process.  *See Chisom*, 839 F.2d at 1057 ("Plaintiffs allege that the current at-large system of electing Justices from the First District impermissibly dilutes the voting

---

[7]      "Racially polarized voting" ("**RPV**") occurs when there is a pattern of different racial groups voting for different candidates.  For example, in a racially polarized election, Black people vote together for their preferred (frequently Black) candidate, and most non-Black voters vote for the opposing (typically white) candidate.

strength of black voters in Orleans Parish in violation of Section 2 of the Voting Rights Act of 1965"); *see also Allen*, 14 F.4th at 372 (describing the *Chisom* litigation as a "class action suit on behalf of all blacks registered to vote in Orleans Parish, claiming their voters were diluted by the then-existing First District" and stating that "[t]he *Chisom* decree sought to remedy that alleged defect" and must be "read . . . in light of the 1986 lawsuit it settled").

The State has presented no evidence that the purpose behind the Consent Decree has been fully satisfied.  Indeed, the State does not even *acknowledge* (let alone analyze) whether a Section 2 violation would once again present itself absent the remedies implemented by the Consent Decree—most specifically the threatened destruction of the Seventh Supreme Court District that was established pursuant to the Consent Decree to provide an opportunity for voters in Orleans Parish to be able to elect the candidates of their choice in "future Supreme Court elections." Consent Decree at 6, ECF No. 257-4.

In order to dissolve the Consent Decree, therefore, the State should have to demonstrate that it is no longer necessary.  Such a demonstration would require the State to show that the underlying conditions for a Section 2 violation are no longer present.  That analysis is involved, fact-dependent, and a far cry from the superficial reasoning offered by the State in its motion.  A full analysis of the State's burden would require a hearing assessing, at a minimum, the three preconditions for a Section 2 violation laid out by the Supreme Court in *Gingles*: (1) whether the Black population in and around Orleans Parish is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) whether Black voters are politically cohesive in their support for their preferred candidates; and (3) whether, in the absence of majority-Black districts, candidates preferred by Black voters would usually be defeated due to political cohesion

of white voters in support of different candidates.[8]  *See Gingles*, 478 U.S. at 46, n.11.  A full

analysis does not end at these factors, however, because in the presence of the *Gingles* conditions

courts also consider the "totality of the circumstances" in light of the so-called "Senate Factors"

to determine whether minority voters "have less opportunity than other members of the electorate

to participate in the political process and to elect representatives of their choice."[9]  *Gingles*, 478

U.S. at 79-80 (1986).  To demonstrate "a significant change" in circumstances, therefore, the State

should have to show, as a threshold matter, that the *Gingles* and Senate factors are *no longer*

present or, at a minimum, are so altered as to justify modifying the Consent Decree.  Any serious

attempt to make that fact-intensive showing would presumably require an evidentiary hearing,

expert testimony, and findings of fact.

The State's has not even attempted to make this threshold showing.  Instead, the State

focuses almost exclusively on pretextual concerns over "malapportionment," which, as described

---

[8]     Together, the second and third *Gingles* preconditions are commonly referred to as RPV.  *See also supra* n.6.  The "two most important factors" in a vote dilution case are "the existence of [RPV] and the extent to which minorities are elected to public office." *Clark v. Calhoun County*, 88 F.3d 1393, 1397 (5th Cir. 1996) (citing *Gingles*, 478 U.S. at 48 n.15); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1122 (5th Cir. 1991*); see also Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 499 (5th Cir. 1987) ("[RPV] is the linchpin of a § 2 vote dilution claim."); *McMillan v. Escambia County*, 748 F.2d 1037, 1043 (5th Cir. 1984) ("[RPV] will ordinarily be the keystone of a dilution case").

[9]     The "Senate Factors" are named for the Senate Report accompanying the 1982 Voting Rights Act amendments in which they were first laid out. *Gingles*, 478 U.S. at 43-45. The Senate Factors are: (1) the extent of any history of discrimination related to voting; (2) the extent to which voting is racially polarized; (3) the extent to which the state or political subdivision uses voting practices that may enhance the opportunity for discrimination; (4) whether minority candidates have access to candidate slating processes; (5) the extent to which minority voters bear the effects of discrimination in areas of life like education, housing, and economic opportunity; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which minority people have been elected to public office; (8) whether elected officials are responsive to the needs of minority residents; and (9) whether the policy underlying the voting plan is tenuous.  *Id.* at 36-37.  However, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45.  It will be "only the very unusual case" in which the three *Gingles* factors exist but a violation of Section 2 cannot be established under the totality of circumstances.  *Clark v. Calhoun Cty.*, 21 F.3d 92, 97 (5th Cir. 1994).

further below, could readily be addressed without dissolving the Consent Decree or threatening the effectiveness or existence of the Seventh Supreme Court District.

Perhaps the reason that the State has not attempted to address the purpose of the Consent Decree is that there is significant evidence that the *Gingles* factors would still be present and a Section 2 violation would persist in the absence of the Consent Decree.  With respect to the first *Gingles* precondition, it continues to be the case that the Black population in and around Orleans Parish is significantly large and geographically compact to constitute a majority in a single-member district.[10]  Moreover, based on preliminary analysis conducted by Plaintiffs, it is likely that the Seventh District, as a majority-Black district, could be diluted or even eliminated, given the significant white population in parishes that border Orleans Parish and the evidence that, with respect to the second and third *Gingles* preconditions, Black and non-Black voters in those surrounding parishes prefer different candidates; thus the presence of additional white voters in the Seventh District, who fail to support the candidates of choice of Black voters in any significant numbers, would undermine or eliminate the effectiveness of the Seventh District for Black voters.

Plaintiffs' preliminary analysis is consistent with the RPV findings of numerous courts in Louisiana.  Indeed, courts have continued to find patterns of RPV throughout Louisiana.  *See Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) (holding that the district court did not err in its

---

[10]     Maps that are not malapportioned have been presented to the legislature in which the Seventh Supreme Court District remains a majority-Black district, and which illustrate that the Black population in and around Orleans Parish is sufficiently large and geographically compact to constitute a majority.  Those maps are available at: https://redist.legis.la.gov/2020_Files/PlanEvals/SupremeCourt/LDF_7_Seat_ Supreme_Court_Combine.pdf and http://legis.la.gov/Legis/ViewDocument.aspx?d=1244999.  Moreover, there are competing bills that have just been introduced to alter the Supreme Court Districts, including a bill that would expand the court to nine seats.  Now, more than ever, this Court should retain jurisdiction while the legislative process continues to play out to ensure the continued existence and effectiveness of the Seventh District.  *See*, *e.g.*, http://legis.la.gov/Legis/ViewDocument.aspx?d=1245087; http://legis.la. gov/Legis/ViewDocument.aspx?d=1244999;   http://legis.la.gov/Legis/ViewDocument.aspx?d=1245083; http://legis.la.gov/Legis/ViewDocument.aspx?d=1245083.

finding of racially polarized voting in local judicial elections); *La. State Conference of NAACP v. Louisiana*, 490 F. Supp. 3d 982, 1019 (M.D. La. 2020) (finding sufficient preliminary evidence of RPV statewide to support plaintiffs' allegations of vote dilution in Louisiana's Supreme Court district map).[11]  In recent years, the existence of RPV in Louisiana—and specifically in parishes that buttress New Orleans—has prompted Section 2 litigation to establish an ability-to-elect judicial district in Jefferson Parish, *Williams v. McKeithen*, No. 05-1180 (E.D. La. 2005), and prompted litigation to block a new redistricting plan for the St. Bernard Parish School Board that would have denied Black voters an opportunity to elect candidates of their choice, *St. Bernard Citizens for Better Gov't*, No. Civ. A. 02-2209, 2002 WL 2022589, at *7 (E.D. La. Aug. 26, 2002). Further, research conducted by Plaintiffs shows that there are extremely high levels of RPV in each of the four parishes that border on Orleans Parish (Jefferson Parish, Plaquemines Parish, St. Bernard Parish, and St. Tammany Parish).[12]  The risk of a Section 2 violation in the absence of the Consent Decree is especially high because the State has not disclosed how it would draw a new map for the Supreme Court Districts, nor has it even committed to maintain the Seventh Supreme Court District as an ability-to elect district for Black voters where the conditions, as here, necessitate it.

---

[11]      *See also Citizens for a Better Gretna v. City of Gretna*, 636 F. Supp. 1113, 1124 (E.D. La. 1986); *Major v. Treen*, 574 F. Supp. 325, 337 (E.D. La. 1983) (The court found that there was racial polarization in Orleans Parish).  Most recently, in 2021, the DOJ sued the City of West Monroe under Section 2 over its at-large alderman elections.  The DOJ contended that there was RPV sufficient to satisfy *Gingles* because "[i]n contests between Black candidates and White candidates for West Monroe Board of Alderman and other parish, state, and federal positions, White voters cast their ballots sufficiently as a bloc to defeat the minority's preferred candidate."  The court agreed and entered a consent decree between the parties.  *United States v. City of West Monroe*, No. 21-cv-0988 (W.D. La. Apr. 14, 2021).

[12]      Admittedly, the evidence of Plaintiffs' research is not before the Court.  But that only emphasizes the point: the State has not made any kind of a record on which this Court can assess its burden to show a significant change in circumstances.  Plaintiffs mention their research only to highlight that, had the State undertaken any serious investigation of the facts, it would have found that the circumstances that gave rise to the Section 2 violation that prompted the Consent Decree are still in place.

The State's motion fails to grapple with any of the analytical work necessary to demonstrate that Consent Decree's purpose has been fulfilled and that a Section 2 violation would not resume in the absence of its protections.  That work is necessary to meet the State's burden, and its failure to do so is fatal to its motion.

## 2.      The State's Reliance on Dicta in the *Allen* Decision is Misplaced.

Instead of adducing evidence or addressing the purpose of the Consent Decree, the State rests on dicta in the Fifth Circuit's decision in *Allen*.  But that dicta neither controls here nor alleviates the State's burden to make the necessary showings under *Rufo*.

In *Allen*, the Fifth Circuit held that the Consent Decree did not preclude other federal courts from hearing voting rights challenges involving other Louisiana Supreme Court Districts aside from the Seventh District.  *Allen*, 14 F.4th at 368-69.  The Fifth Circuit concluded that the other Districts were not "frozen" and, after affirming the district court's exercise of jurisdiction, stated that, given Justice Johnson's service as Chief Justice of the Louisiana Supreme Court and her subsequent retirement, "one might think the decree's final remedy has been implemented."  *Id.* at 374.  The panel went on to acknowledge that it "need not decide that question," and to emphasize that the jurisdictional question presented on appeal was "the only issue we decide today."  *Id.* at 374-75.  The Fifth Circuit's statements on the Consent Decree's "final remedy" were not based on record evidence, and had nothing to do with the question on appeal: whether the Middle District (as opposed to the Eastern District court with jurisdiction over this action) had jurisdiction to review a voting rights challenge involving another of the Supreme Court districts given the Consent Decree's continued existence.  Indeed, the Fifth Circuit specifically acknowledged that neither the plaintiffs nor the State raised the issue of whether the Consent Decree remains in effect, and referred to that aspect of the State's litigation strategy as "weak sauce."  *Id.*  Accordingly, the Fifth Circuit's supposition regarding the continued efficacy of the Consent Decree—an issue that

the panel recognized it was "not decid[ing]"—is pure dicta and is not binding on this Court.  *See Knight v. Kirby Offshore Marine Pac.*, 983 F.3d 172, 177 (5th Cir. 2020) (emphasizing that a statement by the Court of Appeals concerning an issue "unnecessary for deciding the issue before the court" is "*dictum* and, concomitantly, not binding precedent"); *Creasy v. Charter Comms., Inc.*, 489 F. Supp. 3d 499, 506 n.4 (E.D. La. 2020) ("[W]here 'general expressions' in an opinion 'go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.'" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821)).

To the extent the State maintains that Justice Johnson's successful tenure on the Louisiana Supreme Court somehow means the Consent Decree has "accomplished its objective," such argument is meritless, particularly where the underlying objective of the Consent Decree is at risk. Nowhere in the Consent Decree does it state that its purpose will have been achieved once a justice sitting in the *Chisom* seat is sworn in as Chief Justice of the Louisiana Supreme Court, especially when, as is the case now, there are significant indicia that Section 2 violations could recur in the absence of the Consent Decree.  Justice Johnson's successful tenure on the Louisiana Supreme Court does not demonstrate that—absent the Consent Decree—the circumstances that gave rise to Section 2 violations have been remedied.  Rather, Justice Johnson's tenure (along with the elections and service of Justice Revius O. Ortique, Jr. and Justice Piper D. Griffin) are evidence that the Consent Decree protects minority voting rights, and will continue to do so until the system does so itself.[13]  *See Chisom*, 839 F.2d at 1057-58 (observing that, prior to the Consent Decree,

---

[13]     Plaintiffs acknowledge that the Consent Decree is not intended to exist in perpetuity, *Allen*, 14 F.4th at 373, and that many of the "action items" contemplated by the Consent Decree have been fulfilled since its entry in 1992.  But the Consent Decree's terms suggest that the relief it encompasses will extend into the future, perhaps contemplating that it would take many years for Louisiana's electoral system to rid itself of the Section 2 violations it addresses.  *See* Consent Decree at 6, ECF No. 257-4 (stating that "future Supreme Court elections after the effective date [of the Consent Decree] shall take place in the newly

"no black person has ever been elected to the Louisiana Supreme Court, either from the First Supreme Court District or from any one of the other five judicial districts").

Given the risk that the State will undermine the effectiveness of, or even eliminate, the Seventh District as a district that provides an opportunity for Black voters to elect the candidates of their choice in light of the significant white voting population in parishes that border Orleans Parish, the ongoing evidence of RPV patterns in those areas, the fact that the State has not disclosed how it would draw a new map for the Supreme Court Districts, and the fact that the State has not made clear whether it would maintain the Seventh Supreme Court District as an ability-to-elect district, the State's motion should be squarely rejected.

**B.     The State's Purported Concern over "Malapportionment" is Unsupported, Pretextual, and Wrong.**

The State next argues that dissolution of the Consent Decree is necessary to correct for population malapportionment within Louisiana's Supreme Court districts.  But the State's purported concern over malapportionment is pretextual.  First, and most importantly, the Consent Decree expressly authorizes the State to reapportion Supreme Court districts based on population changes, as long as it maintains the Seventh Supreme Court District as a majority-Black district, in light of continued RPV and other circumstances; it is therefore entirely unnecessary to dissolve the Consent Decree to correct malapportionment.  Second, while rebalancing the populations among the Louisiana Supreme Court districts to correct malapportionment is an equitable consideration, the State is not legally obligated to correct for malapportionment.  Third, there is no urgency to correct for malapportionment—*which is less severe now than it was following the 2010 census*—and the State's arguments otherwise amount to nothing more than a cover for its

_____

reapportioned districts.").  As stated above, the State has presented no evidence that the relief contained in the Consent Decree is no longer necessary to ensure a fair and just electoral system for justices of the Louisiana Supreme Court, and the Consent Decree must remain in place until such exists.

unjustified desire to rid itself of the Consent Decree and destroy the Seventh Supreme Court District.

> **1.    The Consent Decree Authorized the State to Correct for Malapportionment, and Dissolution is Unnecessary.**

The State contends that the Supreme Court districts have been "frozen by the *Chisom* Consent Decree" and have thus "devolved into severe malapportionment."  *See* Def.'s Mot. at 8. The State is plainly incorrect.  To the contrary, the Consent Decree, through its adoption of Act 776 in the Amended Consent Decree entered on January 3, 2000, expressly authorizes the State to reapportion the Supreme Court districts based on population as long as it adheres to its requirement to maintain Seventh Supreme Court District as an ability-to-elect district for Black voters.  Indeed, the Fifth Circuit made this clear in its recent *Allen* decision.  *See Allen*, 14 F.4th at 372-73 (rejecting the State's "extravagant[]" read of the Consent Decree and finding that "a federal consent decree cannot manacle a state's entire judicial election system based on an alleged violation in *one* district" as it "would lack the authority to enter such a decree, even if the parties asked it to").  The Consent Decree did not have the effect of "freezing" the Supreme Court districts.

As the State recounts in its Motion, the Consent Decree required the State to enact "[l]egislation . . . in the 1998 regular session of the Louisiana Legislature" that would "provide[] for the reapportionment of the seven districts of the Louisiana Supreme Court in a manner that complies with the applicable federal voting law, taking into account the most recent census data available" and "that provides for a single-member district that is majority Black in voting age population."  *See* Consent Decree ¶ 8.  Consistent with this directive, and as the State acknowledges, the Louisiana Legislature adopted Act 776 on June 3, 1997, which set forth the new Supreme Court districts.  *See Chisom*, 890 F. Supp. 2d at 70.  Following the passage of Act 776, the parties to the Consent Decree filed a joint motion to amend the Consent Decree by

incorporating Act 776, which this Court granted on January 3, 2000.  The Amended Consent Decree expressly adopted Act 776 "as an addendum" to the Consent Decree.  Am. Consent Decree at 3, ECF No. 257-5.

But the State's overview of Act 776 omits that the legislation did more than set the bounds of the new Supreme Court districts, it specifically allows for the decennial redistricting that the State now claims is only possible through the dissolution of the Consent Decree.  Specifically, Act 776 provides that:  "The legislature may redistrict the supreme court following the year in which the population of this state is reported to the president of the United States for each decennial federal census."  Act 776 § 101.1(E).  By adopting that language, the Consent Decree contemplates that the legislature would undertake decennial reapportionment based on population and that the legislature will maintain the objective of the Seventh Supreme Court District to provide electoral opportunity for Black voters when doing so.  The State's position that the Supreme Court districts were somehow "frozen" by the Consent Decree (or, more egregious, that the Consent Decree is to blame for malapportionment) is accordingly baseless.  *See Allen*, 14 F.4th at 372-73 (finding that the State's position that the Consent Decree "'dictat[ed] the perpetuation' of the entire 1997 redistricting" and gave the Eastern District "'exclusive jurisdiction' over '*all future* elections' in all 'seven Louisiana Supreme Court districts'" overread the decree "extravagantly" and finding that "a federal consent decree cannot manacle a state's entire judicial election system based on an alleged violation in *one* district" as it "would lack the authority to enter such a decree, even if the parties asked it to").

Even more confounding is the State's contention that the Consent Decree must be dissolved to accomplish a purpose *that the Consent Decree itself expressly authorizes*.  There is no necessity, nor legitimate reason, to dissolve the Consent Decree in order to reapportion for population

equality when the Consent Decree, by its express terms, already permits the State to do so (and has permitted the State to do so for more than two decades). *See Cooper v. Noble*, 33 F.3d 540, 544 (5th Cir. 1994) (limiting instances when courts have discretion to modify consent decrees pursuant to Rule 60(b) to "[w]hen significant changes in factual conditions make a consent judgment *unworkable*, make compliance *substantially more onerous*, or make enforcement detrimental to the public interest") (emphasis added).

> ### 2. There Is—In Any Event—No Legal Obligation to Correct for Malapportionment.

Even if the Consent Decree did not permit reapportionment (which it does), there is no legal obligation to correct for malapportionment in judicial districts. The State maintains that malapportionment within the Supreme Court districts is "in violation of the one man, one vote principle." Def.'s Mot. at 7. But that is simply wrong. "[T]he concept of one-man, one vote-apportionment does not apply to the judicial branch of government." *Wells v. Edwards*, 347 F. Supp. 453, 454 (M.D. La. 1972), *aff'd*, 409 U.S. 1095 (1973). As the *Wells* court explained, and as later affirmed by the Supreme Court, "the rationale between the one-man, one-vote principle, which evolved out of efforts to preserve a truly representative form of government, is simply not relevant to the makeup of the judiciary." *Id.* at 455; *see also Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 211 (5th Cir. 1980) ("[W]e are bound with respect to this specific issue by the Supreme Court's affirmance in *Wells*."). Rather, in the context of judicial redistricting, population equality is only one of many equitable considerations. *See Clark v. Roemer*, 777 F. Supp. 445, 453 (M.D. La. 1990). Relevantly, the *Wells* decision assessed reapportionment of judicial districts for the election of justices to the Louisiana Supreme Court, the very election at issue here. *Id.* at 455 ("the election of Justices of the Supreme Court of Louisiana falls into [the] category" of elections that are not required to comply with the one-person, one-vote principle).

Thus, population apportionment among judicial districts is no more than an equitable, but not necessary, principle that does not bear the weight the State would put on it.  The State has no legal obligation to correct malapportionment and cannot justify dissolving the Consent Decree on that basis.

### 3.    The State Has Never Acted Urgently to Reapportion Supreme Court Districts.

The State presents the need to correct for malapportionment in the Supreme Court districts as "urgent."  But unlike the reapportionment of legislative bodies, neither federal nor state law requires judicial reapportionment to occur on any specific timeline.  Moreover, the State's current, sudden "urgency" for reapportioning the Supreme Court districts is belied by its failure to reapportion them to correct for malapportionment over the last several decades, despite evidence that the Supreme Court districts have been malapportioned since at least the 2000 Census and the malapportionment following the 2010 Census was *even greater* than it was following the 2020 Census.[14]  And, as noted, the Consent Decree expressly authorizes the State to reapportion the Supreme Court map to reflect population shifts (with the caveat that it keep the Seventh Supreme Court District a majority-Black district where the conditions necessitate such a district).

As the State has wholly failed to meet its burden to show a significant change in circumstances that calls for the dissolution or event modification of the Consent Decree, its motion must be denied.  *See Boerne*, 659 F.3d at 438-39 (reversing modification of consent decree where movant failed to demonstrate a change in circumstance warranting such relief); *see also Sierra*

---

[14]     Based on a preliminary analysis by Plaintiffs, the Supreme Court District map was malapportioned by 18.0% following the 2000 Census, 54.5% following the 2010 Census, and 54.4% following the 2020 Census. Indeed, District 7 has become substantially less malapportioned since 2010, when it was underpopulated by 32.3%, compared to 28.4% today.

*Club v. Meiburg*, 296 F.3d 1021, 1033-34 (11th Cir. 2002) (affirming denial of motion to modify consent decree where movant failed to show change in circumstance warranting such relief).

## II. The State Has Not Established that Dissolution of the Consent Decree is "Suitably Tailored" to Address the Alleged Changed Circumstances.

Even if the State had satisfied its burden to show significant "changed circumstances" that warrant modification of the Consent Decree (which it plainly has not), the State has also failed to show that dissolution "is suitably tailored to resolve the problems created by the change in circumstances." *Rufo*, 502 U.S. at 391. The Supreme Court has made clear that "[a] court should do no more" than what is necessary to resolve the problems created by the alleged change in circumstance "for a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Id.* And it is the movant's burden "to prove that modification is warranted, regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely." *Boerne*, 659 F.3d at 438 (citing *Rufo*, 502 U.S. at 384).

In support of its position that dissolution is the "only permissible modification under existing law," the State claims that the Consent Decree somehow "obstructs" the principles of the Voting Rights Act by "standing in the way of the State's effort" to "draw[] all of it [sic] voting districts in a way that animates the letter and the spirit of the 1965 Voting Rights Act[.]" Def.'s Mot. at 12. But the State presents nothing to evidence this lofty contention. Indeed, as stated above, the Consent Decree expressly permits the reapportionment that the State claims is necessary. That fact alone is fatal to its claim that termination is the appropriate remedy here. *See Cooper*, 33 F.3d at 544 (calling for movant to show that significant changes in circumstance "affect compliance with, or the workability or enforcement of, the final judgment").

23

To the extent that the State's interest in correcting for malapportionment is legitimate, Plaintiffs stand ready and willing to work collaboratively with the State to reapportion the Supreme Court map as contemplated by Act 776 (*i.e.*, in a manner that achieves substantial population equality while adhering to the Consent Decree's requirement to protect against violations of Section 2). Plaintiffs' preliminary analyses suggest that such a map could easily be developed, and maps that would achieve that goal have been introduced in the Legislature. Accordingly, the State could accomplish its purported goal of correcting for population malapportionment without dissolving the Consent Decree.

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court deny the State's Motion to Dissolve the Consent Decree in its entirety.[15]

Dated: February 8, 2022                    Respectfully submitted,

    Leah C. Aden*                    */s/ Ronald L. Wilson*
    Michael Pernick*                 Ronald L. Wilson, #13575
    NAACP Legal Defense &            701 Poydras, Suite 4100
    Educational Fund, Inc.           New Orleans, LA 70139
    40 Rector St, 5th Fl.            Tel.: (504) 525-4361
    New York, NY 10006               Fax: (504) 525-4380
    Tel.: (212) 965-7715             Cabral2@aol.com
    laden@naacpldf.org

---

[15] To the extent the Court concludes that the State's motion cannot be decided as a matter of law, Plaintiffs reiterate its request that the Court request further briefing based on evidence (including expert evidence) and, ultimately, hold an evidentiary hearing on whether modification or dissolution of the Consent Decree is warranted under Rule 60(b), with the State bearing the heavy burden of proof. *See Boerne*, 659 F.3d at 438-39; *see also Thomasville*, 401 F. Supp. 2d at 498-502 (resolving a Rule 60(b)(5) motion to dissolve a consent decree in a Section 2 vote dilution case only after considering extensive evidence adduced at a hearing, including evidence of the continued existence of RPV); *Johnson v. Hamrick*, 196 F.3d 1216, 1223 (11th Cir. 1999) ("the resolution of a voting dilution claim requires close analysis of unusually complex factual patterns") (emphasis added); *Williams v. Bd. of Comm'rs of McIntosh Cnty.*, 938 F. Supp. 852, 858 (S.D. Ga. 1996); *Project Vote v. Blackwell*, 1:06-CV- 1628, 2009 WL 917737, *10 (N.D. Ohio Mar. 31, 2009) (calling voting rights "an area of law that [is] anything but simple"); Br. of Joaquin Avila, et al. as Amici Curiae in Supp. of Resp'ts at 16, *Shelby Cnty., Ala. v. Holder*, No. 12-96 (U.S. Feb. 1, 2013) (explaining that "Section 2 actions have become increasingly complex and resource-intensive in recent years."); *id.* at 17; *see also id.* at 18-19 (referencing the Federal Judicial Center's 2003-2004 District Court Case-Weighting Study, Table 1 (2005) (finding that voting cases consume the sixth most judicial resources out of sixty-three types of cases analyzed)).

Michael de Leeuw*
Martin S. Bloor**
Amanda Giglio*
Cozen O'Connor
3 WTC, 175 Greenwich St.
55th Floor
New York, NY 10007
Tel.: (212) 908-1131
Fax: (646) 461-2042
mdeleeuw@cozen.com

Andrew D. Linz*
Nathan Larkin**
Cozen O'Connor
Liberty Place, 1650 Market St.
Suite 2800
Philadelphia, PA 19103

William P. Quigley, #07769
Loyola University School of Law
7214 St. Charles Ave.
New Orleans, LA 70118
Tel.: (504) 710-3074
Fax.: (504) 861.5440
Quigley77@gmail.com

*Attorneys for Plaintiffs Ron Chisom, Marie
Bookman, Walter Willard\*\*\*, Marc
Morial\*\*\*, Henry A. Dillon, III\*\*\*, and the
Louisiana Voter Registration/Education
Crusade\*\*\**

\*    Motion for admission *Pro Hac Vice*
     pending

\*\*   Motion for admission *Pro Hac Vice*
     forthcoming

\*\*\* These Plaintiffs moved on February 8,
     2022 to be removed as parties to this
     action.  Prospective Plaintiff the Urban
     League of Louisiana simultaneously
     moved to be added as a plaintiff in this
     action, and fully adopts this Opposition as
     its own.

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that, on this 8th day of February 2022, a true and correct copy of the foregoing Plaintiffs' Opposition to Defendant's Motion to Dissolve Consent Decree was served on all counsel of record via the Court's CM/ECF filing system.


*/s/ Ronald L. Wilson*