## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RONALD CHISOM, ET AL.,**<br>    **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **NO.  86-4075** |
| **JOHN BEL EDWARDS, ET AL.,**<br>    **Defendants** | **SECTION: "E" (1)** |

### ORDER AND REASONS

Before the Court is a Motion to Dissolve Consent Decree filed by the State of Louisiana, through Jeff Landry, in his official capacity as Attorney General of the State of Louisiana (the "Attorney General").[1] Plaintiffs Ronald Chisom, Marie Bookman, and the Urban League of Louisiana (the "*Chisom* Plaintiffs") have filed an opposition.[2] Plaintiff-Intervenors the United States and Justice Bernette Johnson also have filed oppositions.[3] The Attorney General has filed a combined reply to all three  oppositions.[4] On March 24, 2022, the Court heard oral argument on the Motion to Dissolve Consent Decree.[5] For the following reasons, the Attorney General's Motion to Dissolve Consent Decree is **DENIED**.

---

[1] R. Doc 257.

[2] R. Doc. 284. On April 26, 2022, the Court granted the *Chisom* Plaintiffs' motion to drop Walter Willard; Marc Morial; Henry A. Dillon, III; and the Louisiana Voter Registration/Education Crusade as plaintiffs. R. Doc. 317. On May 3, 2022, the Court granted the *Chisom* Plaintiffs' motion to add the Urban League of Louisiana as a plaintiff. R. Doc. 319.

[3] R. Docs. 286, 287.

[4] R. Doc. 299.

[5] R. Doc. 314. John Bel Edwards, in his official capacity as Governor of the State of Louisiana, is also a Defendant is this case, having been substituted in place of former Governor Bobby Jindal pursuant to Federal Rule of Civil Procedure 25(d). R. Doc. 312. Governor Edwards did not enroll new counsel until May 6, 2022, after the Motion to Dissolve Consent Decree was already fully submitted. R. Doc. 322. The Court then granted the Governor leave to file a response on behalf of the State to the Motion to Dissolve Consent Decree on or before May 23, 2022. R. Doc. 323. No response was filed by that time.

## BACKGROUND

On September 19, 1986, Ronald Chisom; Marie Bookman; Walter Willard; Marc Morial; Henry A. Dillon, III; and the Louisiana Voter Registration/Education Crusade filed a class action complaint against the State of Louisiana and several of its officials in their official capacities challenging the method for selecting Louisiana Supreme Court justices from the then-First Supreme Court District as violative of the Voting Rights Act of 1965, 52 U.S.C. § 10301, because it diluted the strength of minority voters in Orleans Parish.[6] At that time, the First Supreme Court District, which included four parishes (Orleans, which had a majority minority population, and Jefferson, St. Bernard, and Plaquemines, which had majority White populations), elected two "at-large" justices, while the remaining five districts elected one justice each.

After six years of litigation, involving numerous appeals to the United States Court of Appeals for the Fifth Circuit and one successful appeal to the United States Supreme Court, the parties entered into a Consent Judgment, signed by Judge Charles Schwartz on August 21, 1992.[7] The Consent Judgment took effect upon the Louisiana Legislature's enacting legislation codifying its terms, which was done by the enactment of Act 512 of 1992 that same year.[8]

The Consent Judgment did the following. First, it created a new supreme court district "comprised solely of Orleans Parish," from which a new justice would be elected

---

[6] R. Doc. 1. Before editorial reclassification into Title 52 in 2014, the Voting Rights Act was previously contained at 42 U.S.C. § 1973.

[7] R. Doc. 120; R. Doc. 257-4 (attaching a copy of the Consent Judgment).

[8] Act No. 512, 1992 La. Acts 1486. Because it created the temporary eighth *Chisom* seat on the Louisiana Supreme Court, Act 512 was later declared violative of the Louisiana Constitution's numerative limit on supreme court justices, but the Consent Judgment's remedies, which Act 512 simply codified, remained valid and in effect. *Perschall v. Louisiana*, 96-0322, pp. 26-28, 30 (La. 7/1/97), 697 So. 2d 240, 258-60; *see also Perschall v. Louisiana*, No. CIV. A. 95–1265, 1997 WL 767703 (E.D. La. Dec. 10, 1997), *aff'd* 174 F.3d 197 (5th Cir. 1999).

when a vacancy opened in the former at-large district.[9] Second, the decree created a temporary "*Chisom* seat" on the Supreme Court; this seat was to be filled by an eighth justice—drawn from a new slot on the Louisiana Fourth Circuit—who would serve in rotation with the other justices.[10] The *Chisom* seat would cease to exist, however, upon the seating of a justice elected from the newly-created Orleans Parish district.[11] Third, the decree called for legislative "reapportionment of the seven districts of the Louisiana Supreme Court."[12] Specifically, "[t]he reapportionment [would] provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety," effective January 1, 2000.[13] This last task was accomplished in 1997 by the passing of Act 776 of 1997, which provided for the formal and permanent reapportionment of the state's supreme court districts and created a seven-district map that included a new majority-Black district—the present District Seven—encompassing almost all of Orleans Parish.[14] Because Act 776 did not draw District Seven exactly as contemplated by the Consent Judgment, but was nevertheless a satisfactory reapportionment, in December 1999 the parties moved to add the provisions of Act 776 as an addendum to the Consent Judgment, which Judge Schwartz approved on January 3, 2000.[15] The districts created by Act 776 remain in effect today. Finally, the Consent Judgment provides this Court "shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished."[16]

---

[9] R. Doc. 257-4 at 3.
[10] *Id.* at 4-6. The eighth justice holding the *Chisom* seat and the seven regular justices were assigned on a rotating basis to panels of seven justices, and the court's cases were assigned randomly to the seven-judge panels for decision. *Id.* at 4.
[11] *Id.*
[12] *Id.* at 6.
[13] *Id.*
[14] R. Doc. 135 (motion and Order amending Consent Judgment to add Act 776 as an addendum) (citing Act No. 776, 1997 La. Acts 1265).
[15] *Id.*
[16] R. Doc. 257-4 at 8.

In 2012, federal litigation arose over the interpretation of the Consent Judgment with respect to counting years of service on the Supreme Court by the justice who filled the temporary *Chisom* seat.[17] The dispute concerned the tenure of then-Justice Bernette Johnson, who was elected to the *Chisom* seat in 1994 and to the District Seven seat in 2000.[18] Interpreting the decree, the Court ruled Justice Johnson was to be fully credited for her service since 1994.[19] In doing so, the Court rejected the State's argument that the Court lacked jurisdiction in 2012 because "complete implementation [of the Consent Judgment] was accomplished on October 7, 2000 when Justice Johnson was elected to the Supreme Court from the Seventh Supreme Court District."[20] Addressing this argument, the Court held:

> There has been no affirmative ruling by this Court that the Consent Judgment has been completely satisfied and thus has been vacated or terminated, nor has there been any request that this be done. Because the Court finds that the "final remedy" under the Consent Judgment has not yet been accomplished, the Court has continuing jurisdiction and power to interpret the Consent Judgment as requested by Justice Johnson and the *Chisom* Plaintiffs. The explicit terms of the Consent Judgment provide the Court continuing jurisdiction over this dispute, stating that the Court "shall retain jurisdiction over this matter until the complete implementation of the final remedy has been accomplished." While it is true "that district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees," and are "instead constrained by the terms of the decree and related order," the very terms of the Consent Judgment in this case provide the Court with a sufficient jurisdictional basis to resolve the dispute pending before it. This is true after the 2000 amendment to the Consent Judgment, even though the amendment did not include this same "continuing jurisdiction" language. The amendment did not replace the terms of the original Consent Judgment, but instead supplemented them.

> Because, as will be explained in the pages to follow, the Court finds that the Consent Judgment calls for Justice Johnson's tenure from November 16, 1994, until October 7, 2000, to be credited to her for all purposes under Louisiana law, the Court finds that the "final remedy" in the Consent Judgment has not yet been implemented. By law and by the terms

---

[17] R. Docs. 137, 146, 159, 173, 197; *see Chisom v. Jindal*, 890 F. Supp. 2d 696 (E.D. La. 2012).
[18] *Chisom*, 890 F. Supp. 2d at 707-08.
[19] *Id.* at 711-18.
[20] *Id.* at 709.

of the Consent Judgment, this Court expressly retains jurisdiction over this case until that final remedy is implemented. This Order is an exercise of the Court's discretion to enforce and protect its orders.[21]

After the Court's ruling, the Louisiana Supreme Court determined Justice Johnson was the most senior justice for purposes of succeeding to the office of chief justice.[22]

Nearly a decade later, on December 2, 2021, the Attorney General filed a motion to dissolve the Consent Judgment, arguing the decree's objectives have been fulfilled and population imbalance among supreme court districts requires the State to redraw all districts, including District Seven.[23]

## LAW AND ANALYSIS

"Consent Decrees are subject to Federal Rule of Civil Procedure 60(b),"[24] which provides several methods by which "the court may relieve a party or its legal representative from a final judgment, order, or proceeding."[25] Of relevance in this case, the Court may relieve a party of a final judgment under the first clause of Rule 60(b)(5) when "the judgment has been satisfied, released, or discharged" or under the third clause of Rule 60(b)(5) when "applying it prospectively is no longer equitable."[26]

When faced with motions to terminate or modify consent decrees, courts historically applied the standard used by the Supreme Court in *United States v. Swift & Co.*, which required the party seeking termination or modification to make "a clear showing of grievous wrong evoked by new and unforeseen conditions."[27] However, in the

---

[21] *Id.* at 711 (footnote omitted) (citations omitted).
[22] *In re Off. of Chief Just., La. Sup. Ct.*, 2012-1342 (La. 10/16/12), 101 So. 3d 9.
[23] R. Doc. 257.
[24] *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 437 (5th Cir. 2011) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)).
[25] Fed. R. Civ. P. 60(b).
[26] Fed. R. Civ. P. 60(b)(5). The Attorney General also cites the catch-all provision in Rule 60(b)(6), which allows the Court to relieve a party from a final judgment for "any other reason that justifies relief," but the Attorney General does not provide any argument regarding this subsection. *See* R. Doc. 257-1 at 10-12.
[27] *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932).

1990s, the Supreme Court clarified in two cases that the *Swift* "grievous wrong" standard is not appropriate for all cases and was instead suited only to the particular facts of that case.[28] Rather, in 1991 in *Board of Education of Oklahoma City Public Schools, Independent School District No. 89 v. Dowell* and, the next year, in *Rufo v. Inmates of Suffolk County Jail*, the Supreme Court instructed courts to employ a "flexible standard" when deciding whether to terminate institutional reform consent decrees.[29] Even under this flexible standard, the burden is on the moving party to show termination is warranted.[30]

The Attorney General seeks to terminate the Consent Judgment through two theories: 1) under the first clause of Rule 60(b)(5) because the final remedy of the Consent Judgment has been satisfied, or 2) under the third clause of Rule 60(b)(5) because it is no longer equitable to apply the Consent Judgment prospectively due to malapportionment of population among the Louisiana Supreme Court districts, which the Attorney General argues is a changed circumstance that requires the State to reapportion the districts free from the limits of the Consent Judgment.[31] The Court will address each argument in turn.

---

[28] *Bd. of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89 v. Dowell*, 498 U.S. 237, 247-8 (1991); *Rufo*, 502 U.S. at 379-80. In particular, *Swift* was a prolonged antitrust case, enjoining meat-packing companies from manipulating the meat-packing industry and banning them from engaging in the manufacture, sale, or transportation of other foodstuffs. *Rufo*, 502 U.S. at 379 (discussing *Swift*). The Court rejected the companies' attempt to modify the decree because they "were positioned to manipulate transportation costs and fix grocery prices in 1930, just as they had been in 1920" when the decree was entered. *Id.*

[29] *Rufo*, 502 U.S. at 380 (recognizing *Dowell* sounds the "same theme" of flexibility); *see also Dowell*, 498 U.S. at 247-48 ("From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination."); *Frew v. Janek*, 780 F.3d 320, 323, 327 (5th Cir. 2015) (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)); *League of United Latin Am. Citizens*, 659 F.3d at 437.

[30] *League of United Latin Am. Citizens*, 659 F.3d at 438.

[31] *See* R. Doc. 257-1 at 7-8.

I. **The Consent Judgment Is an Institutional Reform Decree Designed to Ensure That, Under the Voting Rights Act, Black Voters in Orleans Parish Have an Equal Opportunity to Participate in the Political Process, Both at the Time the Consent Judgment Was Entered and in the Future.**

At the outset, the Court finds it useful to discuss the purpose of the Consent Judgment, as it will be useful throughout the analysis. This exercise requires the Court to interpret the Consent Judgment. "Consent decrees are hybrid creatures, part contract and part judicial decree," and courts interpret them "according to general principles of contract law."[32] Courts consult the contract law of the relevant state, here Louisiana.[33] Under Louisiana law, courts seek the parties' common intent starting with the contract's words, which control if they are clear and lead to no absurdities.[34] "Furthermore, a contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions."[35] When a contract resolves a lawsuit, it "extends only to those matters the parties intended to settle and the scope of the transaction cannot be extended by implication."[36] Such a contract "must be considered as a whole and in light of attending events and circumstances."[37]

The Consent Judgment repeatedly states its purpose is to ensure compliance with Section 2 of the Voting Rights Act. The preamble states:

---

[32] *Allen v. Louisiana*, 14 F.4th 366, 372 (5th Cir. 2021) (first quoting *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018); and then quoting *Frew v. Janek*, 780 F.3d at 327) (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975)).

[33] *Id.* (first citing *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996); and then citing *Frew v. Janek*, 780 F.3d at 327 n.28).

[34] La. Civ. Code art. 2045 (2022).

[35] *Baldwin v. Bd. of Sup'rs for Univ. of La. Sys.*, 2014-0827, p. 7 (La. 10/15/14), 156 So. 3d 33, 38 (citing La. Civ. Code art. 2050).

[36] *Trahan v. Coca Cola Bottling Co. United, Inc.*, 2004-0100, p. 15 (La. 3/2/05), 894 So. 2d 1096, 1107 (first citing La. Civ. Code art. 3073; then citing *Ortego v. State, Dept. of Transp. & Dev.*, 96-1322, p. 7 (La. 2/25/97), 689 So. 2d 1358, 1363; and then citing *Brown v. Drillers, Inc.*, 93-1019, p.7 (La. 1/14/94), 630 So. 2d 741, 748); *see also* La. Civ. Code art. 3076 ("A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express.").

[37] *Id.* (first citing *Ortego*, 96-1322, at p.7, 689 So. 2d at 1363; and then citing *Brown*, 93-1019, at p.8, 630 So. 2d at 748).

The Chisom plaintiffs and the United States contend that the provisions contained in Act No. 512 (1992) and in this Consent Judgment are necessary to bring the system for electing the Louisiana Supreme Court into compliance with Section 2. . . . [The Defendants] believe that the relief contained in this consent judgment will *ensure* that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act.[38]

The substantive portion of the Consent Judgment repeats this purpose: "It is hereby ORDERED, ADJUDGED, & DECREED: . . . . The relief contained in this consent judgment will *ensure* that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act."[39]

The Consent Judgment was specifically aimed at correcting and guarding against the dilution of Black voting power in Orleans Parish. The preamble states the old First District "dilute[d] black voting strength in violation of Section 2 of the Voting Rights Act . . . because black citizens have less opportunity than other members of the electorate to participate in the political process and elect justices of their choice."[40] When discussing who is the prevailing party, the Consent Judgment reiterates its purpose is "to *ensure* black voters in the Parish of Orleans have an equal opportunity to participate in the political process and to elect candidates of their choice."[41] Thus, most of the substantive provisions of the Consent Judgment are devoted, as the Fifth Circuit has noted, "to the creation of the Supreme Court district in Orleans Parish and the operation of its new justice."[42]

While the Consent Judgment implements certain specific remedies—*e.g.*, the creation of the temporary *Chisom* seat and the creation of the current District Seven—its

---

[38] R. Doc. 257-4 at 2 (emphasis added).
[39] *Id.* at 3 (emphasis added).
[40] *Id.* at 1.
[41] *Id.* at 7 (emphasis added).
[42] *Allen*, 14 F.4th at 372.

unambiguous language contemplates future compliance. As shown, the Consent Judgment frequently uses the word "ensure." Merriam Webster defines "ensure" as "to make sure, certain, or safe : guarantee."[43] Similarly the Oxford English Dictionary defines "ensure" as "[t]o make certain the occurrence or arrival of (an event), or the attainment of (a result)" or "[t]o make (a thing) sure *to* or *for* a person; to secure."[44] "To ensure" thus carries with it the notion of guaranteeing a future result. Furthermore, the language ordering the creation of District Seven explicitly calls for future compliance:

> Legislation will be enacted in the 1998 regular session of the Louisiana Legislature which provides for the reapportionment of the seven districts of the Louisiana Supreme Court in a manner that complies with the applicable federal voting law, taking into account the most recent census data available. The reapportionment will provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety. The reapportionment shall be effective on January 1, 2000, and *future* Supreme Court elections after the effective date shall take place in the newly reapportioned districts.[45]

An institutional reform decree is one that "reach[es] beyond the parties involved directly in the suit and impact[s] on the public's right to the sound and efficient operation of its institutions."[46] It is clear the Consent Judgment falls squarely within the definition of an institutional reform decree that may be terminated under the flexible standard of *Dowell* and *Rufo*. In fact, the Fifth Circuit has applied the flexible standard for institutional reform decrees to a consent decree remedying vote dilution under the Voting

---

[43] *Ensure*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ensure (last visited May 24, 2022).

[44] *Ensure*, Oxford English Dictionary, https://www.oed.com/view/Entry/62745?rskey=dwRr7C&result=2&isAdvanced=false#eid (last visited May 24, 2022).

[45] R. Doc. 257-4 at 6 (emphasis added). The express call for future compliance distinguishes this case from *Frew v. Janek*, in which the Fifth Circuit terminated a consent decree after the enumerated reforms were put in place, without assessing whether these reforms had the desired outcome. For a more in-depth discussion, see *infra* note 71 and accompanying text.

[46] *Rufo*, 502 U.S. at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

Rights Act.[47] Accordingly, the Court will apply the flexible standard of *Dowell* and *Rufo* to determine whether the Consent Judgment should be terminated.

## II. The Attorney General Has Not Met His Burden of Showing the Consent Judgment Should Be Terminated Under the First Clause of Rule 60(b)(5)—There Has Not Been Implementation of the Consent Judgment's Final Remedy.

A court may terminate a consent decree under Rule 60(b)(5)'s first clause when "the judgment has been satisfied, released or discharged."[48] In the Consent Judgment, this Court retained jurisdiction over this case "until complete implementation of the final remedy has been accomplished."[49] In *Dowell*, a desegregation case, the U.S. Supreme Court laid out a two-part test to determine whether to "dissolv[e] a . . . decree after the local authorities have operated in compliance with it for a reasonable time," stating: "The District Court should address itself to whether the [state] had complied in good faith with the . . . decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable."[50] Although *Dowell* did not specifically rely on Rule 60(b)(5), several courts have cited *Dowell*'s standard in conjunction with motions

---

[47] *League of United Latin Am. Citizens*, 659 F.3d at 437-40.

[48] Fed. R. Civ. P. 60(b)(5).

[49] R. Doc. 257-4 at 8; *see also Chisom*, 890 F. Supp. 2d at 711 (reiterating the Court's retention of jurisdiction until implementation of the final remedy).

[50] *Dowell*, 498 U.S. at 248-50; *see also United States v. Fletcher ex rel. Fletcher*, 882 F.3d 151, 156 (5th Cir. 2018) (applying the *Dowell* standard). All parties cite to the two-part test laid out by the U.S. Supreme Court in *Rufo* for determining whether the Consent Judgment's final remedy has been implemented under the first clause of Rule 60(b)(5). R. Doc. 257-1 at 10 (Attorney General); R. Doc. 284 at 8 (*Chisom* Plaintiffs); R. Doc. 286 at 1 (Justice Johnson); R. Doc. 287 at 8 (United States). However, *Rufo* addressed whether modification of a consent decree was warranted under the third clause of Rule 60(b)(5), when "it is no longer equitable that the judgment should have prospective application." *Rufo*, 502 U.S. at 383 (quoting Fed. R. Civ. P. 60(b)(5)); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. at 441 ("Rule 60(b)(5) allows a party to move for relief if 'it is no longer equitable that the judgment should have prospective application.' . . . In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Court explored the application of the Rule to consent decrees involving institutional reform." (quoting Fed. R. Civ. P. 60(b)(5)); *Frew v. Janek*, 780 F.3d at 327 (noting this standard applies to Rule 60(b)(5)'s third clause concerning equity). *Rufo*'s two-part test does not determine whether the final remedy of the Consent Judgment has been satisfied under the first clause of Rule 60(b)(5).

to terminate consent decrees under the first clause of Rule 60(b)(5).[51] The focus of the *Dowell* test on whether authorities have complied with the decree for a reasonable time aligns with the reasoning of the first clause of Rule 60(b)(5), which provides that a consent decree may be terminated when the decree has been satisfied or implemented.[52]

*Dowell* was decided in the context of a desegregation decree; however, courts have applied its standard—whether the state has complied with the decree in good faith and whether the vestiges of past discrimination have been eliminated to the extent practicable—when deciding Rule 60(b)(5) motions to terminate institutional reform decrees in other contexts as well, citing *Dowell* or its progeny. For example, the Sixth Circuit has applied the *Dowell* standard to institutional reform decrees outside the desegregation context at least twice—racially discriminatory public hiring practices in *Youngblood v. Dalzell*[53] and jail overcrowding in *Johnson v. Heffron*.[54] *Johnson* specifically cited the first clause of Rule 60(b)(5),[55] and, although *Danzell* did not address Rule 60, the consent decree at issue contained a similar term that "the decree may be dissolved 'after the objectives of this Decree have been achieved.'"[56] Similarly, In *Jeff D. v. Otter*, the Ninth Circuit applied the *Dowell* standard, as restated in the later Supreme Court case of *Freeman v. Pitts*, when examining whether to terminate under the first clause of Rule 60(b)(5) an institutional reform decree addressing treatment provided to

---

[51] *See, e.g.*, *Johnson v. Heffron*, 88 F.3d 404, 405 n.1 (6th Cir. 1996) (citing the first clause of Rule 60(b)(5) to examine termination of a jail overcrowding decree); *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011) (citing the first clause of Rule 60(b)(5) to examine termination of decree addressing treatment provided to children with mental disabilities).

[52] The Supreme Court reaffirmed and applied the *Dowell* test in two additional desegregation cases in the 1990s, *Freeman v. Pitts*, 503 U.S. 467, 492 (1992), and *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995).

[53] *Youngblood v. Dalzell*, 925 F.2d 954, 960-62 (6th Cir. 1991).

[54] *Johnson*, 88 F.3d at 406-07. *Johnson* did not directly cite *Dowell* for its standard, but it cited *Dalzell*, which in turn cited *Dowell*.

[55] *Johnson*, 88 F.3d at 405 n.1.

[56] *See Dalzell*, 925 F.2d at 958.

children with mental disabilities.[57] In *Alexander v. Britt*, the Fourth Circuit applied the *Dowell* standard in determining whether to terminate a Medicaid institutional reform decree under Rule 60(b)(5).[58] The Eleventh Circuit has at least twice cited the *Dowell* standard in cases seeking to terminate under Rule 60(b)(5) institutional reform decrees addressing matters outside the desegregation context—teacher certification in *Allen v. Alabama State Board of Education*[59] and the conditions of a mental health facility in *Johnson v. Florida*.[60] Similarly, In *Inmates of Suffolk County Jail v. Rufo* ("*Rufo II*"), the First Circuit applied the *Dowell* standard to a Rule 60(b)(5) motion to terminate an institutional reform decree addressing jail conditions.[61] In *McDonald v. Carnahan*, the Eighth Circuit cited the *Dowell* standard, among other factors, in determining whether to terminate an institutional reform decree concerning death-row conditions of confinement, and although the court did not mention Rule 60, the consent decree at issue contained a similar term that the district court would "insure compliance with the foregoing provisions until such time as all provisions of this decree have been fully implemented."[62]

The Fifth Circuit has not directly addressed the applicability of *Dowell* and its progeny to termination of consent decrees entered outside the desegregation context. In *Frazar v. Ladd*, a case considering whether to terminate a Medicaid institutional reform

---

[57] *Jeff D.*, 643 F.3d at 283-88 (citing *Freeman*, 503 U.S. at 491).

[58] *Alexander v. Britt*, 89 F.3d 194, 199-203 (4th Cir. 1996). The court noted the two tests in *Dowell* and *Rufo*, while employing different factors, "are entirely consistent" and "sound the 'same theme'" of flexibility the Supreme Court has directed courts employ with institutional reform consent decrees. *Id.*

[59] *Allen v. Ala. State Bd. of Educ.*, 164 F.3d 1347, 1350-54 (11th Cir. 1999), *vacated*, 216 F.3d 1263 (11th Cir. 2000). *Allen* was later vacated as a result of a settlement between the parties while a petition for rehearing was pending. 216 F.3d 1263; *see also Johnson v. Florida*, 348 F.3d 1334, 1340 n.3 (11th Cir. 2003) (noting the reason *Allen* was vacated). However, it remains persuasive authority.

[60] *Johnson*, 348 F.3d at 1342-49.

[61] *Inmates of Suffolk County Jail v. Rufo* (*Rufo II*), 12 F.3d 286, 288, 290, 292-94 n.3 (1st Cir. 1993).

[62] *McDonald v. Carnahan*, 109 F.3d 1319, 1321-22 (8th Cir. 1997).

decree, the question was raised, but the Fifth Circuit did not reach the issue.[63] However, the Fifth Circuit has at times indirectly approved of *Dowell*'s application to voting rights cases. In *League of United Latin American Citizens, District 19 v. City of Boerne*, the Fifth Circuit considered whether to modify a consent decree entered under the Voting Rights Act under the third clause of Rule 60(b)(5).[64] In laying out the proper standard, the court cited *Rufo* for the proposition that "[d]istrict courts must take a flexible approach to motions to modify consent decrees and to motions to modify or *vacate* institutional reform decrees."[65] Although the court's discussion of the standard for vacating consent decrees was dicta, unrelated to the issue of modification of the decree in that case, the portion of *Rufo* cited by the Fifth Circuit in reference to vacatur or dissolution of a consent decree discusses *Dowell*:

> The same theme [of flexibility] was repeated in our decision last Term in *Board of Ed. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 246–248, 111 S.Ct. 630, 636–637, 112 L.Ed.2d 715 (1991), in which we rejected the rigid use of the *Swift* "grievous wrong" language as a barrier to a motion to dissolve a desegregation decree.[66]

Moreover, in *Frew v. Janek*, the Fifth Circuit held motions under the first clause of Rule 60(b)(5) are subject to the same flexible theme articulated by the Supreme Court in the context of the third clause; however, the Fifth Circuit did not otherwise announce the applicable factors courts should consider.[67] Several circuits that *have* applied *Dowell*'s factors outside the desegregation context have made the same observation, noting *Dowell*

---

[63] *Frazar v. Ladd*, 457 F.3d 432, 439-40 (5th Cir. 2006).
[64] *League of United Latin Am. Citizens*, 659 F.3d at 437-40.
[65] *League of United Latin Am. Citizens*, 659 F.3d at 437 (emphasis added) (citing *Rufo*, 502 U.S. at 379-80).
[66] *Rufo*, 502 U.S. at 380.
[67] *Frew v. Janek*, 780 F.3d at 323, 327. The Fifth Circuit in *Frew v. Janek* noted that, "[o]wing to school desegregation's unique legal history, the consent decree modification standards articulated in *Freeman* and similar cases may be of limited applicability"; however, the Fifth Circuit was not faced with—and thus did not decide—that issue, as "[n]o party relie[d] on the desegregation cases in th[at] appeal." *Id*. at 329 n.37.

13

is merely a variation on the theme of flexibility stated in *Rufo* and thus may be applied in other contexts.[68]

Accordingly, applying *Dowell*, the Court will examine "whether the [state] ha[s] complied in good faith with the . . . decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable."[69] In determining whether there has been compliance with a consent decree, courts look to the decree's underlying goals.[70] As explained in the previous section, the purpose of the Consent Judgment is to ensure that, under the Voting Rights Act, Black voters in Orleans Parish have an equal opportunity to participate in the political process, both at the time the Consent Judgment was entered and in the future.

First, the Court does not find the Attorney General has met his burden of showing the State has complied with the Consent Judgment in good faith. The good faith inquiry looks to both past compliance and future prospects. When "the goal of the consent decree [is] not just to meet certain standards at a single point in time but additionally for defendants to have the ability to sustain the desired conditions over time," it is "correct [to] consider[] not only what defendants had done up to the present, but also future prospects."[71] While consistent compliance with a decree for several years is evidence of good faith,[72] the Court ultimately must be satisfied "there is relatively little or no

---

[68] *See, e.g.*, *Alexander*, 89 F.3d at 197-99; *Johnson*, 348 F.3d at 1342-44.

[69] *Dowell*, 498 U.S. at 249-50.

[70] *See, e.g.*, *McDonald*, 109 F.3d at 1321; *Dalzell*, 925 F.2d at 960-61; *Jeff D.*, 643 F.3d at 289; *Allen*, 164 F.3d at 1351.

[71] *Johnson*, 88 F.3d at 406. The express call for future compliance in the language of the Consent Judgment distinguishes this case from *Frew v. Janek*, in which the Fifth Circuit terminated a consent decree after the enumerated reforms were put in place, without assessing whether these reforms had the desired outcome. 780 F.3d at 328-30. As explained, when "the goal of the consent decree [is] not just to meet certain standards at a single point in time but additionally for defendants to have the ability to sustain the desired conditions over time," courts must "consider[] not only what defendants had done up to the present, but also future prospects." *Johnson*, 88 F.3d at 406.

[72] *See, e.g.*, *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 297 (5th Cir. 2008); *Alexander*, 89 F.3d at 201.

likelihood that the original . . . violation will promptly be repeated when the decree is lifted."[73] Indeed, some courts have required violators to present a formal plan going forward to demonstrate good faith compliance.[74] In this case, although the State has complied with the terms of the Consent Judgment by enacting Act 512 to create the temporary *Chisom* seat and Act 776 to create the current District Seven, the Attorney General has not shown there is little or no likelihood the original violation will not be repeated when the Consent Judgment is lifted, in other words the Attorney General has not shown there will continue to be a Black opportunity district in Orleans Parish in the future. At oral argument, the Court asked the Attorney General whether terminating the Consent Judgment means

> that the State is free to not have a district in New Orleans where an African-American can be elected? And instead, if the State comes up with a reapportionment plan that splits Orleans Parish up into other districts so that there's no possibility for an African-American to be elected, the plaintiffs, or anybody else who disagrees with that, have to start all over.[75]

The Attorney General responded:

> It is the State's position, Your Honor. If you dissolve an injunction, that injunction is no longer binding on whoever the defendants may have been.
>
> . . . .

---

[73] *Rufo II*, 12 F.3d at 292 (citing *Dowell*, 498 U.S. at 247); *see also Dowell*, 498 U.S. at 247 (noting a court should find "that it [is] unlikely the [violator] w[ill] return to its former ways"); *McDonald*, 109 F.3d at 1322 (noting a court should determine "violation is unlikely to be repeated if decree is terminated" (citing *Rufo II*, 12 F.3d at 293); *Johnson*, 88 F.3d at 406 (noting courts should consider "future prospects" of the defendant's actions (citing *Rufo II*, 12 F.3d at 292)); *Allen*, 164 F.3d at 1351 (alteration in original) ("Further, the trial court must consider whether it is 'unlikely that the school board [will] return to its former ways'" if the decree is vacated.'" (quoting *Dowell*, 498 U.S. at 247)).

[74] *See, e.g.*, *Allen*, 164 F.3d at 1352 ("There is nothing in the record to support the Board's claim that the district court abused its discretion in concluding that it was premature to find that the Board would not return to its former use of discriminatory certification examinations. . . . The Board did not present to the district court the new test which it plans to use, nor did it advise the court what cutoff will be selected by the Board for a passing grade, describe how the test will be validated, or how the Board will attempt to minimize discriminatory impact against African-American teacher candidates."); *cf. Nat'l Ass'n for Advancement of Colored People v. City of Thomasville*, 401 F. Supp. 2d 489, 493 (M.D.N.C. 2005) (terminating a consent decree under the third clause of Rule 60(b)(5) when the state presented a new election plan).

[75] R. Doc. 315 at 10.

> . . . I don't think if the legislature is going to truly reapportion the districts that they can be bound or committed to making any one parish any particular kind of district. The reapportionment rules don't require that and don't mandate that. So if the legislature goes forward with reapportionment and this case is dissolved, then the result that Your Honor described is the result.[76]

Moreover, in recent litigation concerning alleged voter dilution in another of the Louisiana Supreme Court's districts, the State, through the Attorney General, has continued to argue that Section 2 of the Voting Rights Act does not apply to judicial election districts, despite the Supreme Court's clear holding to the contrary in this case.[77]

The only evidence the Attorney General cites of the State's compliance is that Justice Johnson, an African American, was elected to the District Seven seat; eventually became Chief Justice; and after her retirement in 2020, was succeeded in the District Seven seat by Justice Piper Griffin, another African American justice.[78] While Chief Justice Johnson's and Justice Griffin's achievements are laudable and show the efficacy of the Consent Judgment, they do not ensure the violation will not be promptly repeated if the Consent Judgment is terminated. In fact, in 2012 the State actively opposed the interpretation of the Consent Judgment that led to Justice Johnson's elevation to Chief Justice.[79] The Attorney General has not shown that, at this time, the State is committed to maintaining a Black opportunity district. Because the Attorney General has not shown the State is committed to ensuring the violation will not be repeated and that a Black

---

[76] *Id.* at 10-11.

[77] *La. State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Louisiana*, 490 F. Supp. 3d 982, 1019-22 (M.D. La. 2020) (citing *Chisom v. Roemer*, 501 U.S. 380 (1991)) ("Defendants point to no authority that has directly overruled or recognized the overruling of *Chisom v. Roemer*. Until the State does so, this Court is bound to follow *Chisom v. Roemer*'s direct holding."), *aff'd on other grounds sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021).

[78] R. Doc. 257-1 at 7-8.

[79] R. Docs. 197, 200, 202.

opportunity district will be maintained in the future, the Attorney General has not shown the State has complied in good faith.

As to the second part of the *Dowell* test, the Attorney General also has not shown the vestiges of past discrimination have been eliminated to the extent practicable. This inquiry examines whether "the purpose of the consent order has been fulfilled."[80] In the context of desegregation, *Dowell* stated courts determining whether the vestiges of past discrimination have been eliminated should examine the several factors that are "important indicia of [the existence of] a segregated system": student assignments, faculty, staff, transportation, extra-curricular activities, and facilities.[81] In essence, the Supreme Court instructed courts to examine the factors that show discrimination exists to determine whether the vestiges of past discrimination have been eliminated to the extent practicable. Analogizing that principle to this case, the Court finds it appropriate to examine the factors that show there is vote dilution. The Fifth Circuit has indicated this is an appropriate approach in the analogous vote dilution consent decree case under the third clause of Rule 60(b)(5) in *League of United Latin American Citizens*.[82] This case examined whether modification of a vote dilution consent decree was appropriate due to changed circumstances.[83] The Fifth Circuit noted because "[t]he district court is, of course, allowed to consider '[t]he extent to which members of a protected class have been elected to office' in determining if there has been impermissible vote dilution under the Voting Rights Act[,] [t]he district court therefore also may consider such evidence in

---

[80] *Alexander*, 89 F.3d at 202; *see also McDonald*, 109 F.3d at 1321-22 (examining the "goals and terms" of the consent decree); *Johnson*, 88 F.3d at 406 (examining the "goal" of the consent decree).
[81] *Dowell*, 498 U.S. at 237 (first quoting *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 435 (1968); and then quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 18 (1971)).
[82] *League of United Latin Am. Citizens*, 659 F.3d at 439.
[83] *Id.*

determining whether the remedy chosen to rectify impermissible vote dilution is achieving its intended goal."[84]

In determining whether the vestiges of past discrimination have been eliminated to the extent practicable in this case, courts must consider the factors showing there is vote dilution.  In order to prove a case of voting dilution under the Voting Rights Act,  first "[t]he minority group must demonstrate that: (1) it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority's preferred candidates."[85]

"Second, if the preconditions are proved, plaintiffs must then prove that 'based on the totality of the circumstances,' they 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'"[86] As part of this totality of the circumstances analysis, courts should analyze the nine factors laid out in the Senate Report accompanying the Voting Rights Act: 1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2) the extent to which voting in the elections of the state or political subdivision is racially polarized; 3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4) if there is a candidate slating process, whether the members of the minority group have been denied

---

[84] *Id.* (second alteration in original) (quoting 42 U.S.C. § 1973(b) (current version at 52 U.S.C. § 10301(b))).
[85] *Sensley v. Albritton*, 385 F.3d 541, 595 (5th Cir. 2004) (quoting *Clark v. Calhoun County*, 21 F.3d 92, 94–95 (5th Cir. 1994)).
[86] *Id.* (quoting *Clark*, 21 F.3d at 94).

access to that process; 5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; 6) whether political campaigns have been characterized by overt or subtle racial appeals; 7) the extent to which members of the minority group have been elected to public office in the jurisdiction; 8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and 9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.[87]

The Attorney General, who has the burden of proof, did not adequately address these factors. As it now stands, the only evidence the Attorney General has offered to show that vestiges of past discrimination have been eliminated is the elections of both Justice Johnson and Justice Griffin. While election of a member of the minority group is one factor to consider, the Court is not satisfied the election of two justices alone shows the vestiges of past discrimination have been eliminated to the extent practicable. In *League of United Latin American Citizens*, the Fifth Circuit made a similar determination, holding "information regarding one candidate, who won as many competitive elections as she lost," was insufficient to show the "consent decree had failed to achieve its intended purpose" such that modification of the decree was warranted to better remedy vote dilution.[88]

---

[87] *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).
[88] *League of United Latin Am. Citizens*, 659 F.3d at 439; *see also League of United Latin Am. Citizens, Dist. 19 v. City of Boerne* (*LULAC II*), 675 F.3d 433, 437-38 (5th Cir. 2012) (reversing the district court a second time for again failing to develop a record sufficient to decide whether modification of the consent decree was warranted).

The Attorney General's reliance on the Fifth Circuit's recent decision in *Allen v. Louisiana* is unpersuasive.[89] In *Allen*, the Fifth Circuit rejected the Attorney General's argument that the Consent Judgment governs all of Louisiana's supreme court districts, determining that by its terms the Consent Judgment applies only to District Seven.[90] After rejecting the Attorney General's arguments, the Fifth Circuit noted that the Attorney General simply "assume[d]" the Consent Judgment was still in effect, although he had "never asked the Eastern District to vacate the decree" even after "Justice Johnson became Chief Justice and . . . retired."[91] However, the Fifth Circuit explicitly did "not decide that question" of the Consent Judgment's continued effect and left it to this Court to determine whether the final remedy has been implemented.[92]

Accordingly, because the Attorney General has not shown the State has complied in good faith with the Consent Judgment or that the vestiges of past discrimination have been eliminated to the extent practicable, the Court finds the Attorney General has not met his burden of showing the State is entitled to terminate the Consent Judgment as satisfied, released, or discharged under the first clause of Rule 60(b)(5).

### III. The Attorney General Has Not Met His Burden of Showing the Consent Judgment Should Be Terminated Under the Third Clause of Rule 60(b)(5)—It Has Not Been Shown That Continued Enforcement Is No Longer Equitable due to Changed Circumstances or Detriment to the Public Interest.

The third clause of Rule 60(b)(5) allows a court to terminate a consent decree when "applying it prospectively is no longer equitable."[93] The Supreme Court in *Rufo*

---

[89] R. Doc. 257-1 at 6-7 (citing *Allen*, 14 F.4th 366).

[90] *Allen*, 14 F.4th at 371-74. *Allen* involved a vote dilution claim before the U.S. District Court for the Middle District of Louisiana concerning another of the supreme court districts. *Id.* at 369. The State raised this argument about the Consent Judgment's scope on a motion to dismiss for lack of subject matter jurisdiction, arguing only that this Court, as the one overseeing the Consent Judgment, could hear the case. *Id.*

[91] *Id.* at 374.

[92] *See id.*

[93] Fed. R. Civ. P. 60(b)(5).

established a two-part test for when a party seeks relief for these reasons: the party seeking to terminate the consent decree must show 1) "a significant change either in factual conditions or in law" that "make compliance with the decree substantially more onerous [or] . . . unworkable because of unforeseen obstacles[,] . . . or when enforcement of the decree without modification would be detrimental to the public interest"; and 2) "the proposed modification is suitably tailored to the changed circumstance."[94]

"To meet the first part of the test, the party seeking modification must show that the change in circumstance is 'significant,' and not merely that 'it is no longer convenient to live with [the decree's] terms.'"[95] The Attorney General argues the differences in population among the Supreme Court districts are a changed circumstance requiring termination of the Consent Judgment.[96] However, census data shows the current supreme court districts have been malapportioned since 2000, and today they are actually less malapportioned than they were after the 2010 census.[97] The *Chisom* Plaintiffs' analysis of this data shows the districts were malapportioned by approximately 18% after the 2000 census, approximately 54.5% after the 2010 census, and approximately 54.4% after the 2020 census.[98] The *Chisom* Plaintiffs' analysis also shows District Seven in particular has become less malapportioned, shifting from approximately 32.3% underpopulation after the 2010 census to approximately 28.4% underpopulation today.[99] Even before the current districts were drawn in 1997, there were large population disparities among the old supreme court districts. The previous districts originated in the

---

[94] *League of United Latin Am. Citizens*, 659 F.3d at 437 (alterations in original) (quoting *Rufo*, 502 U.S. at 383-84).
[95] *Id.* (quoting *Rufo*, 502 U.S. at 383).
[96] R. Doc. 257-1 at 10-12.
[97] The Court may take judicial notice of U.S. census data. *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011). Data from each census is available on the Census Bureau's website.
[98] R. Doc. 284 at 22 n.14.
[99] *Id.*

prior Louisiana Constitution of 1921.[100] The current constitution, adopted in 1974, provides that these boundaries will be continued as part of the Louisiana Revised Statutes, not the constitution.[101] The same boundaries were reenacted as Louisiana Revised Statutes section 13:101.[102] Section 101, in turn, was not amended until 1997, and only then as a result of this Consent Judgment. Prior to 1997, courts repeatedly noted the malapportionment among these old districts, yet they remained unchanged for seventy-six years.[103] Thus, the Attorney General has not shown a significant change in factual conditions that makes compliance with the decree substantially more onerous.

The Attorney General has also not shown enforcement of the Consent Judgment would be detrimental to the public interest. The State is under no pressing obligation to reapportion the supreme court districts. The U.S. Supreme Court has held the one-man, one-vote principle does not apply to judicial districts,[104] and state law does not require the supreme court districts be equally apportioned.[105] Last year, a bill that would have

---

[100] La. Const. of 1921 art. VII, § 9.

[101] La. Const. art. XIV, § 16(5) ("[T]he following provisions of the Constitution of 1921 are continued as statutes . . . Article VII Sections . . . 9 . . . .").

[102] La. Rev. Stat. § 13:101 (1975) (amended 1997); *see also* Act No. 51, 1975 La. Acts 282, 282-83 ("To amend Title 13 of the Louisiana Revised Statutes of 1950 by adding thereto as a new Section, to be designated R.S. 13:101, to incorporate therein the provisions of Article VII, Section 9, Louisiana Constitution of 1921 which Article XIV, Section 16, Louisiana Constitution of 1974 continues as a statute, to provide for supreme court districts and the election of justices.").

[103] *Wells*, 347 F. Supp. at 454 ("[T]he exhibits submitted by the plaintiff indicate considerable deviation between the population of some of the judicial districts involved . . . ."); *Chisom*, 1989 WL 106485, at *3-4 (noting the percentage of "deviations from the 'ideal district'").

[104] *Wells v. Edwards*, 409 U.S. 1095 (1973), *aff'g* 347 F. Supp. 453 (M.D. La. 1972) ("[T]he concept of one-man, one-vote apportionment does not apply to the judicial branch of the government."); *see also Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 211 (5th Cir. 1980) (citations omitted) ("While excellent arguments have been made as to why the 'one man one vote' principle *should* apply to Judges, we are bound with respect to this specific issue by the Supreme Court's affirmance in *Wells*.").

[105] *See* La. Const. art. V, § 4 (describing the supreme court districts); *Chisom v. Roemer*, No. 86-4075, 1989 WL 106485, at *1 (E.D. La. 1989) ("The Louisiana Constitution does not require that the election districts for the Supreme Court be apportioned equally by population."); J.R. 21(F) (La. 2021), *reproduced in* R. Doc. 287-2 (exempting the supreme court districts from the requirement that they be equally apportioned in the 2021 joint rule for restricting criteria).

added that requirement to the Louisiana Constitution was defeated in the Louisiana House of Representatives.[106]

Furthermore, nothing prohibits the State from reapportioning the remaining supreme court districts. As the Fifth Circuit in *Allen* held, the Consent Judgment does not govern the remaining six districts.[107] Indeed, the Consent Judgment by its very terms allows the State to reapportion the districts. Act 776, which was incorporated into the Consent Judgment,[108] provides, "The legislature may redistrict the supreme court following the year in which the population of this state is reported to the president of the United States for each decennial federal census."[109] The Consent Judgment, by its very terms, thus allows the State to reapportion the supreme court districts, so long as it complies with the Consent Judgment. If the State desires to adjust the boundaries of District Seven, it is free to work with the other parties and present a joint proposed modification of the Consent Judgment, as the parties did in 1999 with Act 776. For these reasons, the Court does not find the Attorney General has shown a significant changed circumstance or detriment to the public interest warrants termination of the Consent Judgment.

Even if the Attorney General did show a changed circumstance or detriment to the public interest, termination of the Consent Judgment is not suitably tailored to accommodating the population shifts. In *Rufo* the Supreme Court cautioned:

> A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional [or lawful] floor. Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored

---

[106] S. 163, 47th Leg., 2021 Reg. Sess. (La. 2021); H.R. Journal, 47th Leg., 2021 Reg. Sess., at 1401-02 (La. June 7, 2021) (recording the vote defeating the bill).
[107] *Allen*, 14 F.4th at 371-74.
[108] R. Doc. 135. When the Court interpreted the Consent Judgment in 2012, then too the Court noted the Consent Judgment "incorporate[es] the provisions of Act 776." *Chisom*, 890 F. Supp. 2d at 714.
[109] Act No. 776, § 101.1(E), 1997 La. Acts at 1268.

to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires.[110]

Although *Rufo* was concerned with modification, courts have looked to whether termination is suitably tailored to the changed circumstances as well.[111] In this case, termination is far beyond what would be necessary to address malapportionment in the Louisiana Supreme Court districts. As stated, the State is free to reapportion the remaining six supreme court districts on its own, and to propose a modification of District Seven's boundaries through amendment of the Consent Judgment, as the parties did in 1999. Indeed, modification rather than termination under the third clause of Rule 60(b)(5) is often a more appropriate remedy to cure hardships caused by changed circumstances.[112]

## **CONCLUSION**

**IT IS ORDERED** that the Attorney General's Motion to Dissolve Consent Decree[113] is **DENIED**.

The Court expressly retains jurisdiction over this case until the final remedy of the Consent Judgment is implemented.

**New Orleans, Louisiana, this 24th day of May, 2022.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[110] *Rufo*, 502 U.S. at 391.
[111] *See, e.g.*, *United States v. Willowridge Estates*, No. 99-3489, 2013 WL 3489864, at *8 (E.D. La. July 10, 2013) ("Cancellation of the entire consent decree goes beyond addressing the problems created by the changed circumstances."); *City of Thomasville*, 401 F. Supp. 2d at 502-03 (considering whether changed circumstances were narrowly tailored to terminating a vote dilution consent decree).
[112] *See, e.g.*, *Allen*, 164 F.3d at 1351-52 (declining to terminate a consent decree but noting "modification may well be in order at a later time"); *Willowridge Estates*, 2013 WL 3489864, at *8.
[113] R. Doc. 257.